RINGER *v.* STATE.

Opinion delivered February 18, 1905.

1. HOMICIDE—DUTY TO INSTRUCT AS TO LOWER GRADES.—Where, on a murder trial, there was evidence tending to show that defendant was guilty of one of the lower grades of homicide, it was error to refuse to instruct in reference to such lower grades when requested by defendant. (Page 265.)

2. SAME—INVOLUNTARY MANSLAUGHTER.—A conviction of voluntary manslaughter will be set aside for error in refusing to submit to the jury the question whether defendant was guilty of involuntary manslaughter, if there was evidence tending to prove that the killing of deceased was accidental, that defendant mistook him for one who had just made a violent attack upon himself, and either believed

that it was necessary to kill his assailant in self-defense, or shot merely to frighten him away; since, if the jury believed defendant's testimony, they may have found that, though the killing was unintentional, yet defendant failed to exercise due care, and therefore was guilty of involuntary manslaughter.  (Page 265.)

3. WITNESSES—CROSS-EXAMINATION—BIAS.—Where a homicide was committed at defendant's store, it was error, on cross-examination of certain of the State's witnesses who were present at the killing, to refuse to require them to answer whether they had not, a short time previous to the day of the killing, made threats that they intended to take charge of the defendant's store on that day and run him away, as the information sought tended to show the animus or bias of such witnesses.  (Page 269.)

Appeal from Yell Circuit Court, Dardanelle District.

W. L. MOOSE, Judge.

Reversed.

STATEMENT BY THE COURT.

In 1902 Harve Ringer lived in Yell County, and carried on a small mercantile business in the country.  On Christmas day of that year several persons met at his store, it having been reported that there was to be what the witnesses called a "turkey shooting" there, and most of these persons came to take part in or to witness the sport.  But Ringer had no turkey, so, instead of a turkey, a chicken was put in a box with its head through a hole in the top, and each party who shot was charged a nickel.  Among the persons who collected there were York McCollum and his three sons, John, Jim and Cage McCollum. York McCollum had with him a Winchester rifle, and one of his boys had a target rifle, and another had an air gun.  The testimony tends to show that a number of these men were more or less under the influence of liquor, and inclined to be merry. The only two chickens that Ringer had at his store were soon killed.  Some of the young men then began shooting at a can with the target rifle, and, the ammunition for this having been exhausted, they then commenced, if we are to believe the witnesses, to shoot at each other's hair with the air gun.  At this time Ringer and York McCollum and one or two of the older men

were in the store. But, an accidental shot from the air gun having entered the store. Ringer went to the door to remonstrate with the young men, telling them that they must quit shooting in the store, as they might hit some one. John McCollum, one of these young men, took exception to the remarks of Ringer, cursed him, and offered to fight him. They thereupon commenced to fight. John McCollum caught hold of Ringer, reached over Ringer's shoulder, and cut him with a knife. Ringer broke away from him, and ran, with John after him. After Ringer had gone some fifty or a hundred yards from the store, he turned around a tree, and ran back to the store, with John following in close pursuit. Just as Ringer entered the store John cut at him with a knife. Ringer ran toward the back of his store, which was a small room, only 12 by 16 feet in dimensions, and picked up his Winchester rifle, turned and fired towards the door. A moment or two before he fired York McCollum, who had been sitting in the store, picked up his Winchester rifle, and started towards the door. The shot fired by Ringer struck him in the back, from the effect of which McCollum fell to the floor and instantly died. Ringer was indicted on account of this killing. On the trial the evidence was conflicting as to whether the shooting of York McCollum was intentional or whether it was an accident resulting from Ringer's attempt to defend himself against an attack which he supposed that John McCollum was about to make upon him.

The presiding judge refused to give the following instruction asked on the part of the defendant: "10. If the jury believe from the evidence that the defendant was justified, under the circumstances, in firing on John McCollum, and, while attempting to shoot the said John McCollum, by accident or misadventure, shot the deceased, York McCollum, against whom he had no evil design, he would not be guilty of an unlawful homicide, and you will acquit the defendant."

He also refused to instruct the jury as to the crime of involuntary manslaughter, or to state to them what the punishment for that offense was.

The defendant was convicted of involuntary manslaughter, and his punishment assessed at two years in the penitentiary, and he appealed.

*U. L. Meade* and *John B. Crownover,* for appellant.

The facts do not justify a conviction. 32 Ark. 337; 33 Ark. 91; 48 Ark. 498; 55 Ark. 384. The court erred in failing to permit the jury to determine the degree of the homicide. 27 Fla. 370; 37 Ark. 580; 34 Ark. 696; 53 Ark. 381; 45 Ark. 165, 472; 49 Ark. 147, 439; 50 Ark. 545; 52 Ark. 45; 2 Bishop, Cr. Pro. § § 620, 692, 695, 719; ·125 Ill. 641. A defendant is excusable in acting according to surrounding circumstances as they appear to him. 59 Ark. 132; 67 Ark. 594; 18 Mich. 314; 20 Am. St. Rep. 75; Whart. Cr. Law, 385; 52 Ark. 45.

*George W. Murphy, Attorney General,* for appellee.

RIDDICK, J., (after stating the facts.) This is an appeal from a judgment convicting the defendant of voluntary manslaughter. The presiding judge refused to give the jury an instruction in reference to the crime of involuntary manslaughter, or to allow them to consider whether he was guilty of that offense. Under our law, an indictment for murder includes all the lower grades of homicide; and where there is evidence tending to show that the defendant was guilty of one of the lower grades of homicide, the judge should instruct the jury in reference thereto, and in such case it is error for him to refuse to do so when requested by defendant. On the other hand, if there is no evidence to show that the defendant is guilty of a lower degree of homicide than murder or voluntary manslaughter, the judge should refuse to instruct in reference to involuntary manslaughter; for to submit the question of whether a defendant is guilty of involuntary manslaughter in a case where there is nothing to show that the homicide was unintentional would be very likely to mislead the jury. We have, then, to consider whether there was in this case evidence which, if believed by the jury, would have sustained a finding that the defendant was guilty of involuntary manslaughter.

The evidence shows that the defendant was violently assaulted by John McCollum, who cut defendant with a knife. Defendant ran into his store, a small room 12 by 16 feet in size. John McCollum pursued him to the door of the store, and cut him again

as he entered the store. His assailant then turned, and ran over a hill in the rear of the store, but defendant did not know this. Excited and bleeding from the wounds he had received, one of which was, according to the testimony of the physician who treated him, four inches long and an inch deep, defendant ran to the back of his store, seized his gun, turned and fired towards the door that he had entered. During the time of this difficulty York McCollum, the father of John, was seated in the store. He had his Winchester rifle with him, and about the time Ringer got to his gun McCollum got up and started towards the door, having his rifle in his hand, but making no demonstration with it. The shot fired by Ringer struck him in the back, and killed him; but on the question of whether Ringer intended to shoot him or not the evidence is conflicting. Some of the witnesses testified that Ringer, as he raised his gun, said to McCollum, "Damn you, you came here for a fuss!" and then shot him. If the jury believed this testimony, they should not have convicted defendant of a lower crime than voluntary manslaughter; but other witnesses testified that Ringer said nothing, but as soon as he got his gun whirled and fired towards the door, and that at that moment York McCollum got in the line of his fire, and was killed. Ringer, they say, at once expressed regret, stating that he "did not intend to hurt York." Ringer also testified that he fired towards the door under the belief that John was about to or had entered it to renew the assault upon him, as he did not suppose that he had abandoned the assault, and that the killing of York was unintentional.

Now, "when a man, in the execution of one act, by misfortune or chance, and not designedly, does another act for which, if he had willfully committed it, he would be liable to be punished—in that case, if the act he was doing were lawful, or merely *malum prohibitum*, he shall not be punished for the act arising from misfortune or chance; but if *malum in se*, it is otherwise." Archbold, Crim. Pro. p. 9; Bish. Crim. Law (4th Ed.), § 414; *Commonwealth* v. *Mink*, 123 Mass. 422. "The wrongful intent being the essence of every crime, the doctrine," says Mr. Bishop, "necessarily follows that whenever a man is misled

without fault or carelessness concerning facts, and while so mis-led acts as he would be justified in doing were the facts what he believes them to be, he is legally innocent, the same as he is morally." 1 Bishop, Crim. Law (4th Ed.), § 383. So in this case the guilt of the defendant depends to a large extent on whether his intention at the time he fired the shot was to do an act made criminal by the law. If the act he intended to do was criminal, then the law holds him responsible for what he did, even though such result was not intended. On the other hand, if he intended only a lawful act, he will not be punished for a result that he did not intend, if he acted with due care. *Commonwealth* v. *Mink*, 123 Mass. 422.

As a matter of course, if defendant intended to shoot York McCollum, the man he killed, he is guilty, for this man had done nothing; but if, on the other hand, he fired the shot to protect himself against John McCollum, then whether his intention was criminal or not must depend upon the circumstances as they appeared to him at the time he fired the shot. The law does not hold it unlawful or criminal for a man to shoot in necessary self-defense; and if the defendant believed that John McCollum was still following up the attack, and that it was necessary to shoot in order to protect himself, then the intention with which the act was done was not criminal; for, as before stated, it is not unlawful to intend to do an act which one honestly believes to be necessary to protect himself, when the circumstances justify such belief. Again, if the defendant knew that John McCollum was not in the doorway, but believed that he was near there, and, thinking that he might renew the attack, fired in order to frighten him, then for a much stronger reason he is not guilty of a criminal intent in firing the shot; for, if one may take life in self-defense, it follows, of course, that he may commit an act designed only to frighten and drive away a person whom he believes is about to assault him.

If we take the evidence of the defendant as true, then the situation at the time he fired the fatal shot was that he had been unlawfully assaulted by John McCollum, had been twice severely wounded, and, bleeding and excited, had fled into his store, a room so small that a person entering the door could not have been over five steps from the defendant. Believing that

McCollum was about to enter the doorway and follow up his assault with a knife, defendant seized his gun and fired towards the door to protect himself against the assault upon his life which he believed was impending, but with no intention of hitting York McCollum, who was in the store at the time with the defendant. Under these circumstances, we are not able to say, as a matter of law, that the intention of the defendant in firing this shot was unlawful and criminal. We think that was a question for the jury.

But it does not follow, because the defendant did not intend to commit a crime, that he is guiltless; for, to quote from Mr. Bishop again, "there is little distinction, except in degree, between a positive will to do wrong and an indifference whether wrong is done or not. On this ground, carelessness is criminal, and supplies the place of the direct criminal intent." But if there was no criminal intent or design on the part of the defendant, and if the death of York McCollum, though unintentional, was still the result of carelessness on the part of the defendant, then he was guilty of involuntary manslaughter. Involuntary manslaughter, says Wharton, is committed "where death results unintentionally, so far as the defendant is concerned, from an unlawful act on his part not amounting to a felony, or from a lawful act negligently performed. Hence it is involuntary manslaughter where the death of another occurs through the defendant's negligent use of dangerous agencies." 1 Wharton, Crim. Law, § 305. If the negligence is gross, the result may even be a higher degree of homicide; and in this case if the defendant knew that he could not shoot without hitting York McCollum, and still fired, he must be presumed to have intended the natural consequences of his act, and would therefore be guilty of a voluntary homicide; but in determining that question regard must be had to the circumstances under which defendant acted.

These are questions for the jury, and we are of the opinion that the presiding judge erred in refusing to submit the question of whether the defendant was guilty of involuntary manslaughter to the jury, for there is evidence which, if believed by the jury, would have justified them in finding him guilty of that crime only.

The tenth instruction asked by the defendant, which is set out in the statement of facts, came near being a correct statement of the law; but it leaves out the requirement of the law that one must use due care, and which we have noticed above.

The presiding judge may have refused this and the other instructions on this line for the reason that the evidence showed conclusively that John McCollum was not in fact making any attempt to enter the store or committing any assault at the time the shot was fired by defendant. But the circumstances under which the defendant acted must be considered in determining whether he acted with due care, and what his intent was at the time he fired the fatal shot. As John McCollum was not present at the time the shot was fired, it follows, of course, that no assault was either committed by or upon him at that time. But defendant may not have known this, for he acted under great excitement and in great haste. He may have believed that McCollum had not abandoned the attack, and he may have fired to protect himself against the attack, or to frighten McCollum away and thus to prevent him from renewing the attack. This is not the case of a man who has not been attacked, but of one who has already been assaulted and dangerously wounded, and who, having done all he can to escape, stands at bay, excited and alarmed for his safety, and whose acts and intentions must be judged in the light of these circumstances.

But we have said all that was necessary in reference to this point in discussing the question of involuntary manslaughter, and have sufficiently indicated our opinion as to the law of the case. It only remains for us to notice a question of evidence. On the cross-examination of certain witnesses for the State who were present at the killing, counsel of defendant propounded certain questions as to whether they had not, a short time previous to the day of the difficulty, made threats that they intended to take charge of the defendant's store on that day, and run him away; but the presiding judge held that these questions were improper, and refused to allow them to be answered. But it is always proper, on cross-examination, to bring out and show the situation of the witness with respect to the parties, his interest, his motives, his inclinations, and prejudices. 1 Greenleaf,

Ev. § 446. These questions, we think, were proper, as the information sought tended to show the animus or bias of the witnesses towards the defendant, which it was proper for the jury to consider in weighing their testimony.

On the whole case, we are of the opinion that the judgment should be reversed, and the cause remanded for a new trial. It is so ordered.