DICKSON AND JOHNSON *v.* STATE.

4110                                    127 S. W. 2d 126

Opinion delivered April 3, 1939.

1162

*H. A. Tucker, Jay M. Rowland, Roy Mitchell* and *E. G. Thacker,* for appellants.

*Jack Holt,* Attorney General and *Jno. P. Streepey,* Asst. Atty. General, for appellee.

BAKER, J. The indictment in this case by the grand jury of Garland county was against Joe Anderson, Lucille Anderson, Alfred (Pug) Dickson, and Clarence (Bill) Johnson charging the crime of murder in the first degree. It was charged that the four of them entered into a conspiracy by which they agreed with each other to commit the crime of robbery upon one Eldon Cooley, and that in furtherance of this design and while in pursuance thereof one of the defendants, the particular one being unknown to the grand jury, killed and murdered the said Eldon Cooley by shooting him.

Joe Anderson and Lucille Anderson were tried together and both convicted. Upon an appeal decided January 30, 1939, this court affirmed the conviction of Joe Anderson, but reversed and remanded for a new trial the case as against Lucille Anderson. *Anderson v. State, ante* p. 600, 124 S. W. 2d 216.

Upon this appeal by Dickson and Johnson the questions are not exactly identical with those in the Anderson Case, *supra.* It was there urged particularly that the confessions made by Dickson and Johnson were not properly admissible in evidence against Anderson and his wife, Lucille Anderson, but it was held under the facts presented that there was no prejudicial error as to Joe Anderson and his conviction was affirmed. Upon this particular case, upon trial in the circuit court, both of the defendants were found guilty of murder in the first degree and punishment in each case was death.

The appellants have furnished us with an elaborate argument and contention in which they insist a reversal in each of these cases is justified. The attorney general has prepared a much more elaborate abstract of the testimony, and we think that the issues involved upon this appeal have been, by both appellants and appellee, forcefully presented for our consideration. It may be said

that there are only two propositions of sufficient importance to justify comment. The first is that the appellants contend that the evidence is insufficient to sustain a conviction. The second question is somewhat unusual, that is to say, that the appellants contend that even though it may be determined that the evidence was sufficient to show a conspiracy to rob Eldon Cooley, the conspiracy ended and its purposes had been fully consummated prior to the time Cooley was killed, and that therefore, to justify a conviction of murder in the first degree the burden was upon the state to prove that these appellants participated in the murder. Both of these propositions are questions of fact and may be settled in determining the sufficiency of evidence.

For the reason that most of the facts are stated in the Anderson Case, *supra,* only such of them will be repeated as may be deemed necessary to state the issues upon the appeal and to preserve the continuity of such facts as must be of controlling effect.

Each of the appellants testified in the circuit court that he had prior to the time of his trial made a voluntary statement which had been offered in evidence without objection. The said statement made by each was offered against the other upon a showing that it had been reduced to writing and read in the presence of both of them and that neither questioned the accuracy of either statement. They only claimed that explanations should be made of certain matters set out in the statements given. It should be said, however, in his testimony appellant Johnson asserted that some of the matters in his signed statement were not true and he said that the reason therefor was the fact that he was so uneducated or illiterate as to be unable to "follow through" when the statement was read to him and the further fact that he was scared or frightened.. Both of these defendants testified in the case and went into minute details in explanation of all matters set forth in their respective statements and the statements given by the other, as well as explanations, corrections or denials of the testimony of other witnesses.

Without resorting to the well known rule that the appellee has the right upon appeal to have the most favorable conclusion of which the evidence may be susceptible to sustain the verdict and judgment of the court, it may be here said that it is without substantial dispute that Joe Anderson, who had never lived in or around Hot Springs, and was unacquainted with local conditions there, reached the home of appellant Johnson, who lived in the country five or six miles from the business district of Hot Springs, about midnight of Tuesday, September 6, 1938. On Wednesday Johnson and Anderson visited the business district of the city. Johnson was in one of the Steuart stores. Anderson, if not in the store, was at or near the front of it some time during the day. On Thursday morning, perhaps around eight or nine o'clock, Anderson and Johnson visited Dickson, who was living with one of his sisters in Hot Springs. He was found to be at work moving some old lumber in the yard. When he had finished, the three of them talked a little while before Dickson went into the bath room, into which Dickson was followed by the other two. All three of them testified about what occurred on that visit. Without giving conclusions as to more material matters resort will be had to evidence of witnesses.

The cases upon appeal were tried immediately following the trial and conviction of Anderson and his wife, and Anderson was called in this case to testify on behalf of the state. He said at the time he was introduced by Johnson to Dickson, Johnson assured him Dickson was a good man to do business with. It is argued by appellants that this remark had reference to the fact that Anderson had offered to furnish money to enable Johnson and Dickson to open a dance hall and beer parlor combined, and that the parties were discussing this matter of business and the remark was applicable to it. Anderson said they were discussing "getting money." When asked to explain what he meant by "getting money," and if they meant "stick-ups" or robberies, he said that was the idea.

He asked about large chain stores in that community and said that Dickson told him of two chain stores operat-

ing in Hot Springs. One being Jett's and the other Steuart's. While Dickson does not deny that this conversation took place regarding the large chain stores, he made his explanation upon the trial saying that the information given Anderson was in response to an idle or apparently disinterested question made by Anderson, and without knowing that Anderson was seeking information to perpetrate a robbery.

All of these matters were gone into by testimony by the three parties who knew about it. Explanations were duly given. The arguments presented upon these matters assumes the correctness of appellants' theory, and, therefore, the insufficiency of proof in that regard. Much other evidence as to surrounding conditions and circumstances was introduced for consideration of the jury. We think the jury may well have reached a decision contrary to the contention appellants make.

Johnson and Anderson both testified that they had served time in the United States prison together, that there was an understanding, if not agreement, that when Anderson had served his time, Johnson having been released first, Anderson would visit him, and the visit made was in accordance with that understanding.

At the time that Cooley, the collector for Steuart's chain stores, reached a particular store, in taking up the day's receipts, Johnson and Anderson were near by. Johnson's explanation is that Anderson had been expecting mail and had been to the postoffice two or three times during the day preceding and the day on which the murder was committed. Johnson's own statement is to the effect that Anderson had said a Mr. Wilson who brought him to the community, would return that day and bring some extra baggage and deliver to him some money and that if he did not get the money that way he would "take it." Although Johnson says that he had advised Anderson that he was not interested in Anderson's proposed robberies he was present, or near by, when the car driven by Cooley in his collection rounds stopped at the Steuart store. He says that Anderson started toward this car remarking, "That is Mr. Wilson now."

Defending his assumed position, Johnson says that he argued with Anderson that this was one of Steuart's cars, and he insisted that he believed it to be such, although upon cross-examination, when he apparently realized the danger of this admission, that he had pointed out the collector's car to Anderson, he then stated that he had never seen the Steuart car prior to that time. Anderson testified that he and Dickson met this car when Cooley had made his collections at that particular store and that Dickson got into the car in the driver's seat and that he (Anderson) made Cooley sit by Dickson while he sat in the back seat, that Dickson drove the car five or six miles out in the country to the place where they robbed Cooley and then stripped him of his clothes in order to delay him in getting to a telephone or otherwise reporting the robbery. Anderson said that after they had taken the money from Cooley, which was done almost immediately after they entered the car, and had driven to the country and stripped Cooley, he returned to the car leaving Dickson with Cooley, that he, Anderson, was too far away to see what took place, but heard several gun-shots. Dickson immediately returned to the car and they drove down near town and parked the car in a side road where its discovery might be delayed. He also testified that he walked to a place where he found Herbert Johnson and asked him to take him to the home of Clarence (Bill) Johnson, where he had been staying during the two days he had been in town. Clarence (Bill) Johnson testified that after he had pointed out the car to Anderson he went to the home of Doc Weldon, where he found his wife and his uncle, Alfred (Pug) Dickson, and that the three of them left a few minutes later, and walked the five or six miles out in the country to his home. Dickson and Johnson, appellants, both admitted they had been at appellant Johnson's home about one hour when Anderson and his wife came in, having been brought out by Herbert Johnson in an automobile.

The effect of their testimony is that after Anderson came in he and his wife began to pack their grips or bags and insisted that Herbert Johnson take them to Little Rock. While they were arguing about going to Little

Rock cars began to pass along the road near the house and Anderson gave up the idea of attempting to go to Little Rock, saying the road had gotten "too hot."

Johnson says he was very drunk and sick and that Anderson asked him how much he, Anderson, owed Johnson for staying with him the two days he had been there, and his answer was that whatever he, Anderson, thought was right. Anderson then gave him some money. While he insists he did not know what sum of money he received, it seems to be undisputed that this amount was given by Johnson to his wife, who later identified the amount was sixteen dollars. Anderson also delivered over, either to Dickson or to Johnson for Dickson, two five dollar bills, which Johnson gave to Dickson. Later in the night, or next morning, Dickson says he returned these two bills to Johnson, who gave them to his wife to put away as she had put away the sixteen dollars the night before.

This money, according to Mrs. Johnson, was concealed in a meal barrel or can, and was kept there until Johnson, or Mrs. Johnson, advised the officers where it might be found.

A few minutes after Anderson and his wife had reached the Johnson home on that night, lights were extinguished, but none of the parties slept except Clarence (Bill) Johnson, who explained that he was too drunk to know what was going on. Mrs. Johnson and Dickson say they were very much frightened by Anderson who went about from yard to house and from room to room, during almost the whole of the night. Anderson and his wife left the Johnson home early the next morning. They went out the back way where they secreted themselves in the woods, and remained hidden until Sunday morning following, when they went to the home of Dora Bunch. This was the same house or home in which Dickson had been living at the time Anderson met him. It is significant that although Dickson had been living at the home of his sister, Mrs. Bunch, for some time, he left there on Thursday afternoon and had another sister drive him to the home of Clarence (Bill) Johnson, where he intended to meet Anderson. He explains this trip as one

he made to investigate the dance hall proposition, that he and Johnson expected to operate upon money furnished by Anderson. His sister, who took him to the home of Johnson, stayed only about five minutes and then drove back to Hot Springs. Accompanying them was a Mr. Wright, who returned with Dickson's sister to town, leaving Dickson at the home of Clarence (Bill) Johnson, where he admits they discussed for a few minutes some of the details of the enterprise in which they were about to engage.

He admits that during this time Anderson took him outside and showed him two pistols or revolvers. One of them had a short or "snub-nosed" barrel and the other a long barrel. He testified that Anderson put both these pistols in his belt a few minutes later when they returned to town. Anderson said that Dickson selected the short or "snub-nosed" revolver and armed himself with it before they returned to town. It seems that both these were of 38 caliber. Anderson said he took another pistol on that occasion when they came to town. He had obtained it from Herbert Johnson, and it was a 32 caliber. The evidence discloses further that a post-mortem was made on Cooley and from his body was taken two 38 caliber bullets. He had been shot three times, and either of two of the shots would have been instantly fatal.

Dickson and Johnson rely upon alibis. Dickson's position in that regard is stronger than Johnson's. The main facts in regard to this alibi are to the effect that within twenty-five or thirty minutes after Dickson had reached the home of Clarence (Bill) Johnson on Thursday afternoon, Johnson and his wife, Anderson and his wife and Dickson got into a coupe driven by Herbert Johnson and returned to the city of Hot Springs. This was perhaps about five-thirty o'clock. Dickson says that after he got into town he and Hazel Johnson, Clarence (Bill) Johnson's wife, went to the home of Doc Weldon where they remained until about eight o'clock that night. At this particular home during the time that Dickson and Mrs. Johnson were there several visitors came. These were used as witnesses to show the fact Dickson was there, and according to the testimony he

had been there from some time about five-thirty o'clock until about eight o'clock. About ten minutes before eight o'clock Clarence (Bill) Johnson came in and the three of them then left to walk the five or six miles back to the home of Clarence (Bill) Johnson. It is somewhat remarkable that although Dickson lived in Hot Springs at the home of Dora Bunch, his sister, he left there on Thursday afternoon and did not return, but went to Clarence (Bill) Johnson's home twice, once late Thursday afternoon and started on a return about eight o'clock at night and remained there until he was arrested Friday morning. He gave as his only excuse for going back that night his desire to visit his nephew.

Dickson offered evidence to contradict the statement of Anderson that he was driving the car, showing by a physician that he was practically blind in his right eye. He testified that he was at one time so blind he had to be led wherever he went. The doctor, who testified about his blindness in his right eye, gave no evidence of a positive character as to his ability to see with his left eye. The evidence, as given by them, discloses that Dickson, Clarence (Bill) Johnson and Johnson's wife returned to the home of Johnson, going through a narrow passageway, which they knew about, crossing the creek on stepping stones, instead of going on the highway that a short time later was "too hot." Just how nearly blind Dickson was was one of the elements of fact and circumstances that was submitted to the jury, who knew according to his own testimony that he was able to travel this narrow passageway at night, and cross the creek on stepping stones, in order to return to the country where he met Anderson an hour later, who was in possession of the money, ten dollars of which was delivered to Dickson and sixteen dollars to Johnson.

When Anderson was arrested Sunday morning after he returned to the home of Dora Bunch, it was found he had $149.70 in his possession. The evidence discloses that Mr. Cooley had collected from the several stores considerably more than that amount, but there was no evidence as to how much was in money and how much was in checks. Anderson said when he returned to the John-

son home on that night he delivered to Dickson the checks as being worthless for the reason they could not use them under the circumstances. He said that Dickson burned these checks in the cook stove on that occasion. He, Anderson, carried the money back to the Johnson home in a bag with the checks and other papers, just as they came from Cooley's hands.

The officers found, when they searched the Johnson home after Johnson and his wife had been arrested, one of the report slips made by one of the Steuart stores and given to Cooley with the collection he had taken up. Several witnesses identified this as having been found at the Johnson home. It was said to have been found in the chimney corner. It is not clear whether this was inside the home in the chimney corner, or on the outside in the corner. There was no doubt about the positive identification of this report slip as being part of the property taken from the possession of Cooley.

On Friday morning after Anderson and his wife had left, Dickson and Johnson both say that they agreed that the two of them and Johnson's wife would stay there at the house, at least until they could see Mr. Young, a police officer, whom they regarded as their friend. Certainly they did deny that Anderson and his wife had been in the home until two or three days later. A sufficient length of time had elapsed within which Anderson might have escaped, although Dickson says he knew escape was impossible as he had gone into the hills and would have to return to the roads and highways where he would be picked up. Perhaps a more detailed statement of the evidence in this record is unnecessary.

We prefer to discuss both propositions relied upon by appellants as a single issue, as we think that will tend to shorten the presentation of all matters controlling upon this appeal. In this discussion we are keeping in mind the fact as argued in appellant's brief that Dickson, Johnson and Anderson, according to Anderson's testimony, were accomplices, and in all we say we give that question due consideration, but we are not forgetful of any of the other material facts, or of the evidence given by each of the parties in his own behalf. In fact, there

is in reality but a single issue; the sufficiency of the evidence under the circumstances.

The contention made is that at the time Cooley was shot and murdered the evidence in this case discloses that the robbery had been completed, that the money was then in the possession of Anderson, and had been since the time he had entered the car and made Cooley enter the car holding upon him a pistol with which he said he was armed. The fact that Anderson was armed is not disputed by either one of the appellants. It is true that Anderson took charge, or physical possession, of the money immediately after Cooley left the place of business to return to the automobile which he was driving in making his collections, but we think it unreasonable to say that the robbery had then been completed by that possessory act.

Robbers would accomplish very little in taking the money and attempting to escape, leaving the victim to spread immediate alarm. The idea is to get possession of the money and prevent an alarm so that possession of it might be kept or retained. The keeping or retention of it was an object of their plans as much so as getting the money. And in furtherance of this plan Mr. Cooley was driven to the country, and in order that they might have more time to escape, he was stripped of his clothing so that he would be reluctant to enter a home or get to a telephone in the immediate community.

We do not know what theory either one of the robbers might have had to cause the slaying of Cooley, but we think it highly probable that the jury considered the fact that Anderson had been in the community only two days, and most of that time had been spent in the country so Cooley could not, and did not, recognize him, but it is highly probable that he knew both Dickson and Johnson and some word from him indicated his recognition of one or the other, if not both, of them causing his slaying. It seems obvious that at the time he was being stripped it was not the intention of his captors to kill him. No blood was found in the automobile, nor on the clothing, but only on the ground where he had fallen after the fatal shots. If he did recognize one of those

robbing him, then a natural furtherance of the scheme followed by them to that extent, no doubt, made the recognized robber feel that his only safety lay in Cooley's destruction.

The jury had before it all this evidence, Dickson's alibi and the fact that Johnson did not return until after the time within which the robbery might have been committed, and it might well have found that all of the parties testifying in regard to the time Dickson was in Doc Weldon's home were mistaken as to the hour. The only witness who fixed a time with any degree of certainty was one who said that after he left Doc Weldon's home and returned to his own home, he took the members of his family to a show that was presumed to open about seven-thirty o'clock. There was no watch or clock in the Weldon home, so the witnesses who testified had no means of giving the time with any degree of exactness. Nor is there any way of fixing any definite time that Cooley was kidnapped and taken to the country. It was not impossible, perhaps, it may well be said not improbable that both Johnson and Dickson were present when Cooley was killed.

We agree with appellants' contention that Anderson in his testimony given in this case was more interested in establishing a defense for his wife than he was in aiding the court to reach exact justice. It may be said in that regard that Anderson had already been convicted. He was perhaps attempting to shield himself by fixing guilt on others. He was the selected company and "pal" of Clarence (Bill) Johnson. He had chosen Dickson as "a man to be relied upon" and Dickson was relying upon him. Dickson says, even according to his own theory, and his idea of self-preservation, that when Johnson had told him that he had pointed out the Steuart car to Anderson and Anderson had driven it away, he was not concerned about this matter in the least, although he knew a robbery was in the making.

It is most probably true as argued by appellants that Anderson did not tell the whole truth untainted with falsehood. Each of the other parties admitted that he

had attempted deception in certain respects, so the jury was not bound by any complete statement, or detail thereof, made by either one of them, but had the right and duty to choose from all these statements that part of the evidence which they believed to be true, the most plausible in conformity with the facts that were established, or undisputed, and determine therefrom their verdict.

The jury, no doubt, found there was a conspiracy and the evidence fully supports a finding from the foregoing facts that the conspiracy had not ended prior to the death of Cooley, but all acts were in the performance of an agreement or understanding among the parties. The testimony of Anderson was corroborated by many physical facts, most of which were admitted as true by each of the appellants. Besides, as the record shows, each testified, and such evidence was a corroboration sufficient to justify conviction.

The foregoing is not an extension of the rule announced by this court in *Clark* v. *State,* 169 Ark. 717, 276 S. W. 849. The court there held that the conspiracy was not complete upon the mere taking of the money, but that the defendant and his confederates, as a part of the act of conspiracy, got into an automobile and left the scene of the robbery and that was a part of the organized scheme they had planned. In other words, the escape was a part of their planning and scheming as much as taking the money. It was, also, held in *Ringer* v. *State,* 74 Ark. 262, 85 S. W. 410, that "if the act he intended to do was criminal then the law holds him responsible for what he did, even though such result was not intended." *Wilson* v. *State,* 188 Ark. 846, 68 S. W. 2d 100.

We have but recently held that the testimony of a defendant may in itself be a sufficient corroboration of the evidence of an accomplice. *Morris* v. *State, ante* p. 778, 126 S. W. 2d 93; *Morris* v. *State, ante* p. 695, 123 S. W. 2d 513.

That rule is applicable here, and each of these appellants has given such testimony as tended to connect him positively with the commission of this crime. Their ef-

forts to make some explanation of their conduct properly submitted to the jury, were determined adversely to their contention and all questions of fact were conclusively decided against them by the jury under a proper submission thereof.

There is no other method whereby disputed matters of fact may be settled. The jury system is the only protection of organized society, the state, from the violation of both public and individual rights. But those charged with criminal acts are so favored as to be clothed with a presumption of innocence until guilt appears beyond a reasonable doubt. In this case, both of the appellants were tried by a jury of their neighbors in the county where both were reared. They made their own explanations of their conduct as established by evidence and their own admissions. Upon this trial one appeared as a man of middle age, making a puerile, puny and apologetic struggle against the stern mandate of the law whose milder restraints he had previously scorned. The other is a very young man, not inexperienced in crime. He is a nephew of the older man. In his desperation occasioned by undeniable situations, not only by evidence he could not contradict successfully, but by his own statements, he resorted apparently to evasion, sought refuge in a feigned forgetfulness, claimed by him to have been induced by voluntary drunkenness.

There remains one other contention that may be mentioned. The appellants argue, and with much vehemence, that this court cannot determine from this record several different propositions, which they deem vital upon the trial of this case. We are not trying this case *de novo*. We consider the facts only to determine if there is sufficient evidence in addition to that of accomplices, to support the verdicts.

We have carefully considered this view of the case, not only the record as made upon the trial, but every contention and argument presented by appellants, and we find no error; but we have determined that the evidence is of substantial nature and ample to support the judgments of the circuit court. The judgments are, therefore, affirmed.