Larry Bee BLY *v.* STATE of Arkansas

CR 77-193 562 S.W. 2d 605

Opinion delivered March 20, 1978
(In Banc)

*William R. Bullock* and *John M. Bynum,* for appellant.

*Bill Clinton,* Atty. Gen., by: *Jesse L. Kearney,* Asst. Atty. Gen., for appellee.

DARRELL HICKMAN, Justice. Larry Bee Bly was convicted of capital murder in the Pope County Circuit Court and sentenced to life imprisonment without parole. On appeal he

alleges five errors, two of which have merit and require reversal.

Bly was accused of participating in the murder and robbery of his drinking friend, Ed Burns. The main witness against Bly was Marty Tumbleson, a fifteen year old accomplice to the murder. The testimony of Bly and Tumbleson does not vary a great deal except as to the actual "robbery" and killing of Burns.

Bly had been crippled since his brother shot him in the back in 1973. Bly began to drink heavily and became a friend and drinking partner of the deceased, Ed Burns, who lived near Clarksville, Arkansas.

On October 13, 1976, Bly and Burns were driving around drunking and decided that young Tumbleson should be found to drive the car. Tumbleson, the brother of Bly's girlfriend Jennifer Tumbleson, had driven the two in the past. They found Marty at a service station around 9:00 p.m. and he agreed to drive them. At the service station, where Tumbleson was found, it was decided that the car needed gas. Burns apparently had $4.00 and agreed to give $2.00 towards gas. Bly felt Burns should give all the money for the gas. There may have been an argument between Burns and Bly at this time but it was apparently nothing out of the ordinary. All three parties left in the car and they drove out into the country eventually stopping at a cemetery.

It is at this point that the testimony of Bly and Tumbleson began to differ. Tumbleson testified that Burns and Bly got into an argument at the cemetery over the $2.00 that Burns refused to pay for the gas. According to Tumbleson, Bly took the $2.00 from Burns. Later Bly started beating Burns severely. After driving awhile they stopped on a backwoods road and got out. Bly asked Tumbleson for his knife and stabbed Burns in the heart one or more times. Then Bly encouraged Tumbleson to stab Burns. Tumbleson dragged the body down near a lake and returned to the car. Bly told Tumbleson to go back and cut Burns' throat to make certain he was dead. Tumbleson admitted he cut Burns' throat.

Bly's story is that when he woke up the back door of the car was open, the back seat was covered with blood and Tumbleson was returning from the lake down the road with a rag in his hand. He informed Bly that he had killed Burns. Bly said he was scared, decided that he would be accused of the killing because he had been seen with Burns, and thought that flight would be the best answer. He was admittedly drunk, as was Burns. Tumbleson had also been drinking.

Bly's and Tumbleson's testimony as to subsequent events did not vary substantially. They picked up Bly's girlfriend and took off for Mississippi. The next day they returned to Hazen, Arkansas, where the boy was let out to hitchhike home. Bly and his girlfriend went back to Mississippi and on to New Orlenas. Bly was arrested in New Orleans but waived extradition.

Tumbleson made at least four separate statements to the police. At first he denied his participation. His story changed each time until his last statement, which was substantially the same as his testimony.

It is our duty in a capital felony case to examine the entire record for not only errors raised on appeal but also those that may be found in the record. Where the sentencing procedure is separate from the trial procedure, as it was here, we also review the sentencing procedure for errors. See *Giles v. State,* 261 Ark. 413, 549 S.W. 2d 479 (1977). In reviewing the evidence in this case we find that the state's case was based on Tumbleson's testimony. Being a capital murder, it was charged that Bly robbed Burns of $2.00 and then killed him. Tumbleson did not actually testify that Bly "robbed" Burns of $2.00. He merely said Bly took the money away from Burns at the cemetery. This is the extent of the proof as to the "robbery." Sometime later, how long we do not know, Burns was killed.

Evidence that a robbery was committed is critical because without it there can be no conviction of capital murder in this case.

The only evidence of robbery is testimony that Bly took $2.00 from Burns. The definition of robbery is:

A person commits robbery if with the purpose of committing a theft or resisting apprehension immediately thereafter, he employs or threatens to immediately employ physical force upon another. Ark. Stat. Ann. § 41-2103 (Crim. Code 1976).

The evidence in this case certainly cannot be characterized as substantial evidence that Bly committed a robbery. Even if we concede there is room for argument on this issue, when we consider the jury's findings as to aggravation and mitigation, we are convinced that the conviction cannot stand. The jury found:

(1) That the murder was committed by someone other than Bly [which could only be Tumbleson.]

(2) That the murder was not committed for pecuniary gain.

(3) That the murder was not committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.

All of these findings are inconsistent with the finding that Bly was guilty of capital murder as charged. If Bly did not kill Burns, if it was not done for pecuniary gain, and, if it was not done to prevent a lawful arrest — that is to prevent discovery of the robbery — then it would not be a murder committed while engaged in the prepetration of a robbery as charged.

Considered as a whole, the question of whether there even was a robbery, the obvious remoteness of the "robbery" from the killing, and the inconsistent findings by the jury in determining the sentence, require us to reverse the case.

There were several other questions raised which may arise on retrial.

The jury requested that it be permitted to rehear part of the testimony of the state medical examiner. The trial judge announced that this would be done but after a brief recess decided to replay the entire testimony. This was probably

error. However, the record is not clear that Bly's objection was correctly made. In the event of a retrial, if this matter comes up again, the court should read or present only that portion of the testimony that the jury requested.

Bly also argues that two photographs were admitted of Burns' body which could only inflame the passions of the jury. We disagree. *Hulsey* v. *State,* 261 Ark. 449, 549 S.W. 2d 73 (1977). It is unlikely that any other objections made by Bly will occur on retrial.

We could reduce the sentence, as we have in some cases, since there was substantial evidence to support a homicide conviction. See Ark. Stat. Ann. § 27-2144 (Repl. 1962). Bly's testimony placed him at the scene of the murder and there was other evidence tending to corroborate the testimony of Tumbleson as required by our decision in *Underwood* v. *State, supra.* However, we cannot say what sentence the jury would have imposed if it found Bly guilty of a lesser degree of homicide. We know of no way to cure the errors except to remand the case for a new trial.

Reversed and remanded.

Harris, C.J., and Fogleman, J., dissent.

John A. Fogleman, Justice, dissenting. I respectfully dissent from the reversal of the judgment in this case. First, but perhaps incidentally, I disagree with the statement that there is no substantial evidence of robbery.

Bly admitted that he knew that Burns had $4.00 when Bly, Burns and Tumbleson started riding around with Tumbleson as chauffeur. He admits that he and Burns had a disagreement when Burns refused to pay $2.00 for some gasoline. Bly admitted that he knew that Burns had $2.00 left in his billfold after paying for the gasoline. Bly didn't know whether he had any money himself at the time. The billfold was found empty near the body. Between the road and the place the body was found, two dimes, two pennies and a quarter were scattered on the ground. Bly did not know whether he could remember Tumbleson's buying $1.40

worth of gas and $.60 worth of cigarettes at Southpark after the killing but before picking up Jennifer.

Tumbleson said that Bly started beating Burns when Burns put up a fuss about Bly's having taken Burns' billfold, and having returned it after having removed the money from it, and when Burns made disturbances which might have aroused the man with whom Burns lived and one of Burns' neighbors. The medical examiner found numerous scratches and "grazes" about Burns' face and forehead. His report stated that the right cheek was bruised. Although he was of the opinion that a fist would be calculated to deliver a blunt force injury and that there was no evidence of a blunt force injury, he said that it was possible that the bruise on the right cheek was caused by a fist and that the scratches and "grazes" could have been caused in a scuffle. He said that bleeding about the face might have been obscured or might have disappeared by the time the body was found, partly because a rain between the time of the killing and the discovery of the body would have tended to wash away blood that might have been on Burns' face.

Bly and Burns were together shortly before Burns was killed. They picked up Tumbleson between 9:00 and 9:30 p.m. They were seen together after the killing, but without Burns, shortly after 11:00 p.m., when they picked up Tumbleson's sister, Jennifer, who lived with Bly. Jennifer borrowed $20.00 from her employer. Bly said that he asked Jennifer to do this and to buy some gasoline, which she bought on credit. He said that he told Jennifer, "I'm going to have to get out of here." He said he was afraid because he had the idea "they" were going to suspect him. Prior to picking Jennifer up, Bly said that there had been a lot of blood on the back seat of his car, and he wanted it out, so he helped Tumbleson clean the car up.

According to Bly, he, Tumbleson and Jennifer went and got their clothes, "hit the freeway" and eventually wound up in Jackson, Mississippi en route to New Orleans. At Jackson, Bly said he sobered up and knew that he was going to get in trouble. Then, he said, they returned to Arkansas and came as far as Hazen, where they let Tumbleson off with the admonition to "Just fend for yourself." Bly said he did this

because he knew he was going to get in trouble himself. On the way to Arkansas they had stopped at a roadside park where Bly said he threw his clothes away, even though he said they had no blood on them and that he did it only to get Tumbleson to throw his clothes away. Bly said he was then "scared of getting in trouble." He admitted throwing away the knife that inflicted the fatal wounds. He threw it out the window as they were driving down the road back to Arkansas. After the knife was thrown away, Bly said that they "washed out the car."

The evidence indicates that Burns had no opportunity to spend his remaining money or otherwise dispose of it. Even under Bly's version, there is a reasonable inference that either Bly or Tumbleson took Burns' money. It is hard to find any motive for Tumbleson to have killed Burns unless he was influenced to do so by Bly or unless Tumbleson took Burns' money himself.

Bly said that, after dumping Tumbleson to "fend for himself," he and Jennifer went to New Orleans where, after they had remained for about two weeks, he asked Jennifer to call her mother. When Jennifer called, her mother reported there was a "fifty-two state alarm out" for Bly for capital felony murder. Shortly thereafter, said Bly, he was arrested in New Orleans by "the FBI."

As the quoted portion of Ark. Stat. Ann. § 41-2103 (Supp. 1977) clearly demonstrates, the force or threat of force need not precede or accompany the theft. Any physical force is any bodily contact, restraint, or confinement or the threat thereof. Ark. Stat. Ann. § 41-2101 (Supp. 1977). Clearly, the jury could properly infer from all the circumstances disclosed by the evidence that physical force was used on Burns in order to prevent apprehension by keeping him from making an outcry and attracting the attention of the man with whom he lived or his neighbor. In considering when a robbery has been completed, in *Dickson* v. *State,* 197 Ark. 1161, 127 S.W. 2d 126, we said:

Robbers would accomplish very little in taking the money and attempting to escape, leaving the victim to spread immediate alarm. The idea is to get possession of

the money and prevent an alarm so that possession of it might be kept or retained. The keeping, or retention, of it was an object of their plans as much so as getting the money. And in furtherance of this plan Mr. Cooley was driven to the country, and in order that they might have more time to escape, he was stripped of his clothing so that he would be reluctant to enter a home or get to a telephone in the immediate community.

It is true that some of our decisions prior to the adoption of the Arkansas Criminal Code, of which the cited sections are a part, would require that the requisite force or threats be prior to or contemporaneous with the taking. See e.g., *Parker* v. *State*, 258 Ark. 880, 529 S.W. 2d 860. But, in the adoption of the Criminal Code, it is certain that the General Assembly felt that the previous definitions of robbery, either by our statutes or by common law, were too narrowly restricted in this respect. The present statute codified the statement quoted from *Dickson*. The statute should not be narrowed or redefined in the first case arising after the adoption of the code. The wisdom of extending the definition of the crime of robbery is a matter addressing itself to the legislative branch, not this court.

As to the trial court's failure to limit the repetition of the medical examiner's testimony to that specific portion of it about which the jury inquired, I do not feel that appellant is in any position to complain, because he never requested that it be so limited. As I see it, he only objected to any of the testimony of this witness being repeated at all.

There does seem to be some conflict in the jury's finding of guilt on the charge of capital felony murder and the special findings in the sentencing procedure. Although I do not feel that these special findings should control the general finding in every instance, it seems to me that there may have been error in the jury verdict, to the prejudice of the defendant, which clouds the sentencing procedure. This would have no effect except as to the punishment imposed and the degree of the offense. The error may properly be attributed to the sentencing procedure, or at most, to the finding as to the degree of the crime.

We have usually corrected errors in the sentencing procedure or in the jury's verdict finding a defendant guilty of a higher degree of crime than the evidence will support by a reduction of the judgment to the proper degree or by a reduction of the sentence. For a discussion in this regard, see *Giles v. State,* 261 Ark. 413, 549 S.W. 2d 479 and the cases cited below. Murder in the first degree is the next lower degree of homicide included in capital murder. See Ark. Stat. Ann. §§ 41-1501, -1502 (Supp. 1977). There is an abundance of evidence to show murder in the first degree and any error here may be corrected by reducing the judgment to one of guilt of murder in the first degree and the punishment to life imprisonment. See *Collins* v. *State,* 261 Ark. 195, 548 S.W. 2d 106; *Wilburn* v. *State,* 253 Ark. 608, 487 S.W. 2d 600; *Walker* v. *State,* 91 Ark. 497, 121 S.W. 925; *Williams* v. *State,* 66 Ark. 264, 50 S.W. 517; *Crowe* v. *State,* 178 Ark. 1121, 13 S.W. 2d 606; *Bagley* v. *State,* 247 Ark. 113, 444 S.W. 2d 567; *Rorie* v. *State,* 215 Ark. 282, 220 S.W. 2d 421; *Abbott* v. *State,* 256 Ark. 558, 508 S.W. 2d 733; *Blake* v. *State,* 186 Ark. 77, 52 S.W. 2d 644; *Hildreth* v. *State,* 215 Ark. 808, 223 S.W. 2d 757.

As early as *Simpson* v. *State,* 56 Ark. 8, 19 S.W. 99, we held that first degree and second degree murder were but statutory regulations of the punishment of the crime of murder, and that the remedy in cases where the jury has found a degree of murder which the proof does not warrant, the verdict stands for the offense of murder but fails as to the degree and, where the jury has erred in fixing the sentence, the prisoner is not prejudiced if the verdict is referred to the lower degree of the offense, and a new trial should not be awarded for an error not prejudicial to the defendant. There we directed the trial court to sentence the accused for murder in the second degree, pointing out that in *Brown* v. *State,* 34 Ark. 232, where the verdict was for manslaughter without specifying whether it was voluntary or involuntary, this court had fixed the punishment at the highest punishment authorized for the lower degree, involuntary manslaughter. In *Brown,* we resolved a doubt about the jury's knowledge of the fact that they could have sentenced the defendant to a lesser degree of the crime, by imposition of the highest punishment for the lower degree.

This situation is quite different from *Bailey* v. *State,* 206

Ark. 121, 173 S.W. 2d 1010, where we reduced the punishment to the minimum for the next lower degree of homicide because we were there remedying an error of the trial court in failing to instruct on the lower degree. It is also to be distinguished from such cases as *Walker v. State,* 91 Ark. 497, 121 S.W. 925, where the jury's error was in the sentencing procedure and the punishment was reduced to the minimum for the degree of homicide of which the defendant was found guilty. To the same effect is *Crowe v. State,* supra, and *Williams v. State,* 183 Ark. 870, 39 S.W. 2d 295, where the punishment for first degree murder was reduced from death to life imprisonment.

This case is more like *Blake v. State,* supra, where we reduced the punishment to the maximum for second degree murder because the evidence was insufficient to support a verdict for first degree murder, but sufficient to support conviction of the lower degree. This case is also to be distinguished from *Bagley v. State,* supra, where we declined to correct error by reducing the punishment or entering a conviction for a lesser degree of homicide, because we felt that the evidence clearly supported the highest degree of murder and because there was error in the court's indicating that the defendant had some duty to show mitigating circumstances when the law did not require this.

There is not a shadow of a doubt that the jury in this case would have returned a verdict of guilt of murder in the first degree if it had not felt that appellant was guilty of the higher degree of crime. The evidence would have supported such a verdict beyond any question. Even though the jury thought that Tumbleson inflicted the fatal wound, it is not reasonable to believe that the jury thought that Bly's participation was relatively minor. Obviously, in marking the particular "mitigating circumstance" on the verdict form, the jury had in mind that Bly was an accomplice to the stabbing and throat-cutting of his drinking companion. It would simply defy reason to believe that this 15-year-old boy concocted and executed this vicious execution with only minor help or encouragement from his sister's paramour.

I would reduce the judgment to conviction of murder in

the first degree and the sentence to life imprisonment, eliminating the phrase "without parole."

I am authorized to state that the Chief Justice joins in this opinion.