Lynette COMBS *v.* STATE of Arkansas

CR 84-177                                               690 S.W.2d 712

Supreme Court of Arkansas
Opinion delivered May 20, 1985

*C. P. Christian*, for appellant.

*Steve Clark*, Att'y Gen., by: *Velda P. West*, Asst. Att'y Gen., for appellee.

GEORGE ROSE SMITH, Justice. On November 12, 1983, a badly decomposed human body was found in Pulaski County near the Arkansas River. An autopsy showed that death had been caused by a gunshot wound in the neck. The body was identified as that of William Ray Burnett, age 30. Investigation disclosed that he had been murdered about two months earlier, though it is not clear from the record whether he had been reported as missing.

On December 13 first-degree murder charges were filed against Hubert D. Henry and the appellant, Lynette (Burnett) Combs, who was Burnett's wife and had been for some ten years. Henry negotiated a plea of guilty in exchange for a 25-year sentence and his agreement to testify against Ms. Combs. The appellant was tried by jury, found guilty, and sentenced to life imprisonment. The only issue on appeal is whether the testimony of Henry, as an accomplice, was sufficiently corroborated.

Before summarizing the evidence we quickly restate settled rules governing the necessity for corroboration. By the terms of the statute the testimony of the accomplice must be corroborated by other evidence tending to connect the defendant with the commission of the offense, and the corroboration is not

sufficient if it merely shows the commission of the offense and the circumstances of it. Ark. Stat. Ann. § 43-2116 (Repl. 1977). When the corroboration is weighed, the testimony of the accomplice must be completely disregarded. The independent testimony may be circumstantial, but it must be substantial evidence and must do more than raise a suspicion of guilt. *Olles* v. *State*, 260 Ark. 571 (1976).

For simplicity, instead of narrating the testimony of the many witnesses we will begin by summarizing the really essential evidence in the case; that is, the version given by the accomplice and that given by the accused. We use the first person, with explanatory comments in brackets.

*Testimony of Hubert Henry.* For about three years before Bill Burnett's death, he and Lynette and I had been together most of the time. At first there was also a woman named Angie. We stayed together but moved around Little Rock a lot, from place to place. Lynette and Angie were prostitutes, and I procured men for them. [There is an implication that the two men were engaged in other illegal "things," but Hubert never said exactly what they were.] After a time Angie decided to get out and go straight. I had sexual relations with both women.

Bill was shot about September 13, 1983. Shortly before that Lynette had asked me to kill Bill; she said she was tired of moving around. I refused. Bill and I spent the first part of the night in question looking for drugs. In the early morning hours we got back to the room where they were staying. They took me in their [brown] station wagon to the place where I was staying, in Calvary Cemetery. [Other testimony and photographs show a small house with all the windows having bars on them. Part of the house was the cemetery office; another part had been furnished with a couch, bed, TV, cook stove, refrigerator, and a bathroom. Close by was a larger storage shed, with a pull-down garage door.] Bill drove the vehicle into the shed; he didn't want to be seen because he was scared of the police. As I started to the house to get marihuana Lynette asked me whether I was still going to do her that favor. I said, no. She reached over and took my Luger pistol from under my belt. I didn't say anything; I didn't think she would do it. It took me a few minutes to roll the marihuana.

When I got back to the shed Bill was laying on his back; blood was coming from his back. I had not heard a shot. I put the

pistol under some newspapers and got it later. She asked what we was going to do. I said I know one thing, we've got to get it up before Mike [the cemetery caretaker] comes back, because it was early in the morning and he would get there about 6:00. We got newspapers, cleaned up, put the body in the back of their station wagon, and drove down to the river. We pulled the body out of the station wagon and down to the river. We went to the car wash and cleaned up the blood that was in the station wagon.

After that we lived at the cemetery together until I was arrested by York [Buddy York, the bondsman on Henry's bond for some other offense. York testified that he picked up Henry on November 26, at the cemetery]. Lynette was free to come and go as she pleased. After the murder we sold the [brown] station wagon for $200, bought a station wagon that had a bad transmission, and then got a yellow station wagon. I was not living with my wife, but Lynette would drive me over there and circle the block until I came out.

*Testimony of Lynette Combs.* Bill and I met in Michigan; I was then 13, he was 15. We never dated anyone else. We were married in 1973. Bill was a good man, good to me. We were very close. We went to church. We went camping and fishing together. I was never a prostitute and never had an affair with anyone.

I last saw Bill on September 13, at 2:00 a.m. We were at our place at Sixth and Cedar. Henry came by and asked Bill to take him home. In about two hours Henry came back, said that Bill had hurt his knee, and I should go to Henry's apartment to bring Bill home. Henry had Bill's station wagon. We went to Henry's apartment in the cemetery. Henry opened the door, looked in like he was talking to somebody, and turned and said to me he wants you to come in. When I walked in, Henry locked the door and said, "I'm going to rape you." I said, "I can't believe you're doing this. I don't understand; why me?" I told him that he would never get away with this, that Bill would be after him.

Henry raped me twice, tied me up, and locked me in a closet. When he left the doors unlocked the next morning, I got loose and saw Henry and three men outside working on a truck. I ran out screaming for help and asking them to call the police. Henry started beating me and dragged me back into the house. He kept me a prisoner for about two months, continuing to abuse me sexually. We would go out in the day, but he always had a gun and

sometimes chained me to the car. After those three men had not offered to help me, I was afraid to ask for help again. Henry told me that if I tried to get away he would kill me. He forced me to take part in selling the station wagon and getting another one.

When Henry was arrested I at once called my friend, Carolyn Nelson, who picked me up at the cemetery. At her house I called my parents in Michigan, to tell them I was all right. [Apparently her father called the Little Rock police the next morning, who came out to question her.] I learned for the first time from the police that Bill was dead. I loved my husband; I never had any thought of divorcing him or killing him. I did not ask Henry to kill him. I was not attracted to Henry in any way. [This is the end of Ms. Combs's summarized testimony.]

Apart from the accomplice's testimony, the State's proof was directed to two points. First, the fundamentals were established by evidence of the finding of Burnett's body, the cause of death, and its identification. Second, an effort was made to dispute the truth of Ms. Combs's expected testimony. Her statements to the police were not introduced, but the prosecution had evidently seen them and devoted much of its evidence to their refutation. The man who bought the station wagon from Henry and Ms. Combs testified about that transaction and said that Henry did not apparently have a gun and that Ms. Combs was not tied up and did not seem to be afraid. His testimony had no tendency to connect the accused with the actual commission of the murder.

Henry's wife testified that Ms. Combs did not appear to be under restraint after the date of the crime, for she drove Henry in the yellow station wagon to the witness's house for a visit and came back to pick him up. Even so, the testimony had nothing to do with the murder itself. An expert witness for the State testified that what proved to be human blood was scraped from three areas in the station wagon that Henry and Ms. Combs had sold, but those findings do not show that the accused was present at the murder or had any part in it.

The only remaining source of possible corroboration is the testimony of the accused herself. She did not, however, admit her guilt in any way, directly or indirectly. She testified to facts intended to establish her innocence, such as her asserted imprisonment until the body was found, which would explain her failure

to report his disappearance. (Under the court's instructions to the jury, Ms. Combs could not be found guilty of any offense if Henry alone committed the murder and she merely failed to report it.)

■ No doubt the jury concluded that much of the accused's testimony was false, leading them to reason that she therefore must be guilty. But that reasoning is forbidden by the statute requiring corroboration and by the State's burden of affirmatively proving the accused's guilt beyond a reasonable doubt. It does not suffice for the State, as purported corroboration, to convince the jury that an accused person has given false testimony. If that were not true, innocent defendants might be afraid to take the witness stand for fear that they would be sentenced to imprisonment for life not for the commission of murder but for the commission of perjury.

The judgment is reversed, and since the proof is insufficient the charge must be dismissed.

HOLT, C.J., and HAYS and NEWBERN, JJ., dissent.

STEELE HAYS, Justice, dissenting. Heretofore we have held the testimony of an accomplice must be wholly disregarded in determining whether there is substantial evidence of the guilt of the accused, no matter how plausible and credible it may seem. By this decision we are adding the requirement that the testimony of the accused must also be wholly disregarded, no matter how incredible per se and implausible in the light of the remaining proof.

I respectfully submit that is a higher quantum of proof than is consistent with either common sense or with our statutory law. Ark. Stat. Ann. § 43-2116 (Repl. 1977) provides:

A conviction cannot be had in any case of felony upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows that the offense was committed, and the circumstances thereof. Provided, that in misdemeanor cases a conviction may be had upon the testimony of an accomplice.

The legislature deliberately used the words "*tending* to connect the defendant with the commission of the offense" and

that if the proof merely showed that a crime had occurred, and the circumstances thereof, it would not be sufficient. (My emphasis). The word "tend" means "to influence in a particular direction," "to have a tendency, conscious or unconscious, to any end, object or purpose." Webster's New International Dictionary, Second Edition.

Since this act was passed in 1883 we have gradually interpreted it with increasing strictness until we are effectively requiring substantial evidence of guilt independent of either the testimony of the accomplice, or now, of the accused. I know of no other area of law where so great a burden of proof exists.

I am unwilling to disregard the testimony of the accused. I recognize some value in avoiding an application of the law that puts the accused in jeopardy of his own version of the events under scrutiny, but the law must often choose between imperfect solutions, and every accused, indeed, every litigant, must weigh the risks inherent in giving testimony, including the risk of being disbelieved. If the accused chooses to testify then it follows that his testimony must be weighed as other proof is weighed, against the tuning fork of truth and if it can be said after disregarding the testimony of the accomplice there is substantial evidence tending to connect the accused to the crime, and overall, substantial evidence to sustain the conviction, the verdict should be upheld.

I can find no precedent to support the position the majority is taking by this decision, that is, that we can consider the discrepancies in an accused's version of the facts if they are made out of court, unsworn, often without the guidance of counsel, but not if they occur *in* court, under oath, and made, presumably, after careful consultation. I note the majority opinion cites no authority for this rather significant holding. What I do find in our own cases supports a contrasting view. In *Clayton* v. *State*, 247 Ark. 643, 447 S.W.2d 319 (1969) and *Ford* v. *State*, 205 Ark. 706, 170 S.W.2d 671 (1943), we said the testimony of the defendant alone may be sufficient corroboration of the testimony of the accomplice:

> The rule is also well established that the testimony of the defendant alone may be sufficient corroboration of an accomplice. In *Dickson and Johnson v. State*, 197 Ark. 1161, 127 S.W.2d 126, we said: "We have but recently held that the testimony of a defendant may in itself be a

sufficient corroboration of the evidence of an accomplice. *Morris v. State*, 197 Ark. 778, 126 S.W.2d 93; *Morris v. State*, 197 Ark. 695, 123 S.W.2d 513." *Ford* at p. 708.

It is obvious the appellant gave the police the same bizarre account she told the jury, in fact she confirms that in her testimony.[1] So why we are drawing a distinction between her version in court as opposed to her version out of court is not made clear. If she is to avoid the stigma of her own conduct for two months after the death of her husband she can do so only by successfully convincing a listener that she lived those long weeks outwardly in a normal fashion, going out in public, to parks, stores and business places as an absolute prisoner, held entirely against her will. That she, by her account, was subjected to repeated rapes and sexual and physical abuse, but was powerless to free herself from an unspeakable ordeal over an eight week period. That somewhat incredible account is contrasted to the testimony of four disinterested witnesses that she had innumerable opportunities to simply walk or drive away, that she was free and on her own time after time. Three of the four went further and stated she gave every indication of being perfectly at ease in her state.

Added to that are other circumstances which, in greater or lesser degree, incriminate the appellant: the presence of blood in six separate places in her station wagon, the sale by *her* of the incriminating vehicle soon after her husband's death; *her* statement, undeniably false, to the car dealer that she needed money to get her husband out of jail; her statement to a witness after the arrest of the accomplice that she was scared and was going to Michigan; the fact that she and the accomplice went to a Safeway dumpster and threw her husband's clothes and belongings away; the fact that all of the pictures of her husband were carefully cut out from her photograph album; finally after being freed of her ordeal by the arrest of her captor, instead of going to the police, she went to the home of a girl friend and it was the police who later contacted her.

I believe the corroborating proof in this case is entirely consistent with other decisions and I would affirm the trial court. See *Henderson v. State*, 279 Ark. 435, 652 S.W.2d 16 (1983); *Bly*

---

[1] Page 249 of the record.

v. *State*, 267 Ark. 613, 593 S.W.2d 450 (1980); *Olles* v. *State*, 260 Ark. 571, 542 S.W.2d 755 (1976); *Jackson* v. *State*, 256 Ark. 406, 507 S.W.2d 705 (1974).

HOLT and NEWBERN, JJ., join in the dissent.