RUSSELL W. PARKER v. STATE OF ARKANSAS

5741 482 S.W. 2d 822

Opinion delivered July 24, 1972

*Fitton, Meadows & Adams,* for appellant.

*Ray Thornton,* Atty. Gen., by: *John D. Bridgforth,* Asst. Atty. Gen., for appellee.

JOHN A. FOGLEMAN, Justice. Appellant Russell Parker was convicted of manslaughter by a jury following his trial for murder in the first degree. For reversal he alleges that the trial court erred when it denied his motion for a directed verdict and when it refused to call Rosemary Jones as the court's witness. A review of the proceedings and evidence indicates that there was no error.

A verdict should be directed only when there is no factual issue to go before the jury. *Keese* v. *State,* 223 Ark. 261, 265 S.W. 2d 542; *Ford* v. *State,* 222 Ark. 16, 257 S.W. 2d 30. On appeal, in criminal cases, as in others, the evidence must be viewed in the light most favorable to the appellee, and the judgment affirmed if there is any substantial evidence to support the jury's verdict. *Murphy* v. *State,* 248 Ark. 794, 454 S.W. 2d 3021; *Stanley* v. *State,* 248 Ark, 454 S.W. 2d 72. A conviction may be had on circumstantial evidence alone if there was substantial evidence to go to the jury because the law makes no distinction between direct evi-

dence of a fact and evidence of circumstances from which the existence of the fact may be inferred. *Lancaster* v. *State*, 204 Ark. 176, 161 S.W. 2d 201. In light of the foregoing rules we state the evidence which we find sufficient to make a jury question.

Richard Sanders had been visiting the appellant, staying in his cabin. All seemed to be going well until the Saturday night before the death of decedent Claude Still. Sanders had gone to sleep at the cabin but was awakened by Parker, who, Sanders said, had returned intoxicated, at about 3:00 a.m., after which the two had "words." He further testified that Parker threatened to kill him and that he thought it best to leave. Sanders admitted that he was "tight."

Sanders left without taking all of his clothes and equipment with him. It would have been necessary to have borrowed Parker's four-wheel drive International Scout to take his belongings from appellant's cabin to the place where Sanders had parked his vehicle, but Parker refused to lend him the Scout. Sanders met the younger Still and his father, D. C. Still, along the way and told them of his recent problems with Parker. Claude Still agreed to go back with him to appellant's cabin to help him collect his gear in safety. Claude knew Parker and said that he could "cool him down." Before going to the cabin Still armed himself with a .38-caliber revolver and a .45-caliber semi-automatic carbine. It appears that decedent also had been drinking.

Upon reaching the cabin Sanders hid behind some bushes while Parker and Claude Still talked. He saw them "square off" at each other, but Parker did not pursue the matter. After that it appeared to Sanders that Parker and Still were then "getting along great."

Meanwhile Melvin Collins and his wife, who were taking a float trip on the Buffalo River, approached. They also had seen Parker and Still involved in menacing gestures. Melvin Collins also heard Parker threaten Sanders. Later though, it appeared to them that Still and Parker were getting along well. They said that there was drinking by all these persons and that they had given some of their beer to them.

Parker, Sanders and the decedent went to the cabin in the Scout and returned with Sanders' belongings. These were stowed in the Collinses' boat, and Sanders left with them. Still left with Parker in the Scout, ostensibly to meet Sanders and the Collinses on the other side of the river. There was evidence that: the .38-caliber pistol was on the seat between the two; the carbine also was carried with them; Parker carried a .22-caliber rifle; Still was driving.

Mrs. Collins testified that Sanders fired a gun into the water. Shortly thereafter she heard some "hollering down the river" from the direction in which Parker and Still had headed. Then she heard three shots which sounded as though they had come from the same place. Melvin Collins' testimony was essentially the same. However, he also stated that Parker was "pretty drunk," drinking heavily, staggering and slurring his words. All three witnesses testified that it had rained that afternoon.

D. C. Still stated that Claude did not come to work on Monday. The elder Still talked with Melvin Collins on Tuesday and was told of the events on Sunday. At this time he was not worried about his son because he had seen Parker recently at "Hall's place." However on Thursday he and Collins began a search for Claude. They found him in a "hole" of water away from the river. They also found the carbine lying at the decedent's feet, but they were unable to find the .38-caliber pistol. They noticed a single set of tire tracks, which looked like those of Parker's Scout, that crossed the river, came out on the other side and led to appellant's cabin.

Sonny Wood, Claude's brother-in-law, also went down to where the body was found. He said that the tracks were deep and appeared to have been made by a "mud or snow type" tire. He said that a check of the tires on Parker's Scout revealed that they were mud or snow tires.

Fred Bearden, the sheriff of Marion County, testified that he had investigated the matter. He said that, in following the tire tracks, he noticed a place where some vehicle had bumped into a big rock along the side of the road. Part of the rock had been chipped off. Wood said that Parker's

Scout had a "dent and a banged up spot where. . . it looked to me that was the vehicle that had hit the rock." He also testified that a second inspection of the vehicle revealed three or four spots that looked like drops of blood.

It was stipulated that Claude Still died from multiple gunshot wounds and that all bullets removed from his body were .38-caliber.

In a case strikingly similar to this one, arising out of the Western District of Arkansas, the testimony reflected that the deceased and the accused, one Bood Crumpton, after having spent the night together, rode off to visit some women who lived four miles away. Crumpton was armed with a pistol. About noon of that day shots were heard in the direction of where the body was later found. Toward evening of the same day Crumpton was seen returning to the house at which both had previously stayed. Crumpton told others that the decedent had left with another person in the latter's buggy and that the decedent asked him to bring his horse back, take charge of all his effects and pay his debts if he did not return by a certain time. The body was not found for more than a month. It was shown that the accused was familiar with the area where the body was located. The court said, "There is no doubt that this testimony was sufficient to lay before the jury, and it would have been improper to [have] direct [ed] a verdict for the defendant. The weight of the evidence and the extent to which it was contradicted or explained away by witnesses on behalf of the defendant were questions exclusively for the jury. . ." *Bood Crumpton* v. *United States,* 138 U.S. 361, 34 L. Ed. 958, 959, 11 S. Ct. 355 (1891).

We are well aware of *Johnson* v. *State,* 210 Ark. 881, 197 S.W. 2d 936, where we reversed the judgment of the trial court in which circumstantial evidence was used in convicting the defendant, but it is easily distinguished from the case before us. It is unnecessary to restate the facts in that case because the distinguishing features are clearly stated in that opinion. There we reversed, not because the conviction was based solely on circumstantial evidence, but, because the circumstances were not sufficient in the absence of any evidence of motive or cause for the alleged

homicide. We noted that the state made no showing of trouble between the parties, nor ill will on the part of the defendant toward the deceased, nor proof that robbery could have been a motive.

The situation is different here. There was testimony from which it would not have been unreasonable for the jury to have concluded that: appellant was angered by the decedent's aiding a man he had previously threatened to kill; Parker, surrounded by Still, Sanders and the Collinses, only feigned friendliness in order to get the deceased to leave the others and come with him; the dent found on Parker's Scout along with the spots of blood sufficiently identified it as the vehicle whose tracks were found at the scene of the crime; the blood on the vehicle originated from Still's wounds; and Parker used the .38-caliber pistol which was on the seat between them to kill Still. Both of the Collinses and Sanders had testified about hearing shouts and pistol fire coming from the direction toward which appellant and Still had gone. The terrain where the body was found was too rough for the ordinary vehicle to traverse. When we consider all this testimony, we are unable to say that there was not sufficient evidence to present a jury question.

We now consider appellant's contention that the denial of his request to have Rosemary Jones called as a witness of the court was error. In his opening remarks to the jury the prosecutor indicated that Ms. Jones had talked with appellant and asked him if he had seen Still; Parker said the last time he had seen the decedent he was with Melvin Collins and Dick Sanders; she told Parker his story wasn't true, and he then told her something else. This witness was not called by the state. Appellant sought to have her called as the court's witness so that he would be free to impeach her testimony. This was refused.

The calling of a witness as the court's witness in a criminal case, either for or against the accused, is a matter resting in the sound discretion of the court. *Smith* v. *United States*, 331 F. 2d 265 (8th Cir. 1964), cert denied, 379 U. S. 824, 13 L. Ed. 2d 34, 85 S. Ct. 49 (1961); 2 Wharton's Criminal Evidence § 704 at 171 (12th Ed., 1955); 58 Am.

Jur., Witnesses § 4 at 25; 98 C.J.S. Witnesses § 350 at 71; Annot. 67 A.L.R. 2d 538 (1959). In the instant case the trial judge offered to call Ms. Jones as a court's witness to ask her specifically whether or not the events related in the prosecuting attorney's opening remarks had in fact occurred. The court also offered to instruct the jury that the prosecuting attorney had failed to call Ms. Jones and that the jury should disregard the statements attributed to her. Both offers were rejected by appellant. However, the instructions read to the jury contained the standard instruction that opening statements were not evidence and should not be considered as such by the jury. Appellant makes no claim, either below or here, that Rosemary Jones was an eyewitness to any of the events forming the basis of appellant's prosecution nor did he make any showing that he feared to call her because he was unable to vouch for her veracity. See *People* v. *Robinson*, 14 Ill. 2d 325, 153 N.E. 2d 65 (1958); *People* v. *Laster*, 413 Ill. 224, 108 N.E. 2d 421 (1952); *People* v. *Cardinelli*, 297 Ill. 116, 130 N.E. 355 (1921); 67 A.L.R. 2d § 3 at 544, et seq. When we consider all of these factors we find no abuse of discretion.

The judgment is affirmed.