John Elliott GRUZEN *v.* STATE of Arkansas

CR 77-111                                     591 S.W. 2d 342

Opinion delivered December 17, 1979
(In Banc)
[Rehearing denied January 21, 1980.]

*Lessenberry & Carpenter,* for appellant.

*Steve Clark,* Atty. Gen., by: *Dennis R. Molock,* Asst. Atty. Gen., for appellee.

JOHN A. FOGLEMAN, Justice. John Elliott Gruzen was convicted of the capital felony murder of Dana Diane Mize. The jury fixed his sentence at life imprisonment without parole. He has chosen to argue four points for reversal. We will first consider those and later examine other objections to determine whether there was prejudicial error in his trial.

Gruzen pleaded not guilty and not guilty by reason of insanity to the charge that, on April 13, 1976, he had committed the crime of capital murder during the course, and in the furtherance, of the kidnap and rape of Dana Diane Mize under circumstances manifesting extreme indifference to the value of human life.

We first treat Gruzen's argument that the trial court abused its discretion in finding him to be competent to be tried, convicted or sentenced. Gruzen had an extended history of psychiatric problems. At the time of the revolting crime with which he was charged, he was 34 years of age and living at the home of his parents in Maplewood, New Jersey. He was an honor graduate of Rutgers University extension college at Newark, although it had taken him nine years to complete the course of studies.

The crime occurred after Gruzen had left his parents' home in New Jersey on April 8, 1976. He left a note to his parents that he was leaving New Jersey for a time in order to try to straighten out his problems. He returned home on April 16, 1976, and immediately contacted Dr. Max Pusin, a psychiatrist who had treated him for seventeen years. After his consultation with Dr. Pusin, it was disclosed that a crime of the nature of an incident he had discussed with Dr. Eugene Revitch, a forensic psychiatrist to whom Gruzen had been referred by Dr. Pusin, had been committed in Faulkner County, Arkansas. Extradition was waived and Gruzen was returned to this state. The information on which Gruzen was put to trial was filed on April 27, 1976.

Upon motion of the prosecuting attorney, Gruzen was committed on June 8, 1976, to the Arkansas State Hospital for examination. The usual 30-day period of observation was extended for two weeks at the request of the Commissioner of Mental Health. On July 19, 1976, the hospital reported a diagnosis of schizophrenia, paranoid type, that Gruzen was "with psychosis" and indicated that there was a need for treatment of Gruzen. An additional 120 days' observation was granted by the trial court upon the prosecuting attorney's request. There was no change in the diagnosis. Thereafter, a hearing on the competency of Gruzen to stand trial was held. Before formal sentencing, a second hearing on Gruzen's competency was held.

In the report on the first examination, it was stated that it was the opinion of the examining psychiatrist, Dr. A. F. Rosendale, and the joint opinion of the psychiatric staff that Gruzen was mentally ill to the degree of legal irresponsibility at the time of his examination, that he probably was at the time of the alleged offense, that Gruzen did not have the mental capacity to understand the proceedings against him or to assist in his own defense and that he was probably suffering from mental disease or defect of such a degree as to make him unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

On December 15, 1976, a hearing was held in order that the trial court might determine whether Gruzen was mentally capable of standing trial. A deposition of Dr. Max Pusin, which had been taken in New Jersey on December 8, 1976, was read into the record. Dr. Pusin testified that he had first examined Gruzen on December 22, 1959. He described Gruzen as one who spent a lot of time in fantasies, both grandiose and erotic, which replaced very harsh reality. He had diagnosed Gruzen as schizoid, and said that Gruzen had, at age 17, deteriorated into a schizophrenic state. He described schizophrenia as the most common serious psychosis in this country. Dr. Pusin had found the presence of paranoid tendencies. He said that Gruzen's thinking was tangential. He stated that, in 1974, Gruzen had unsuccessfully attempted suicide after having investigated and researched the subject, and having become preoccupied with

suicide as early as 1961. Dr. Pusin said that he had caused Gruzen to be hospitalized, for Gruzen's own safety, in a mental hospital in 1961, but that Gruzen had left the hospital contrary to medical advice. He said that Gruzen had renewed his research on suicide in March, 1976. Dr. Pusin said that, after Gruzen's departure from his home April 8, 1976, he returned on April 16 in a great state of excitement, confusion, disorientation and agitation. Dr. Pusin said that he had, on April 17, committed Gruzen to a mental hospital where his diagnosis of paranoid schizophrenia (which Pusin said was acute) was confirmed. Dr. Pusin said that a depressive, progressive depression had been going on since December, 1975 or January, 1976.

Dr. Charles Dean Yohe of Hot Springs, who practices medicine with a specialty in psychiatry, had examined Gruzen three times while he was in the Arkansas State Hospital. Each time took two hours. He had last examined Gruzen the day before the hearing. His diagnosis was schizophrenic reaction, paranoid and catatonic features. His prognosis was very poor. He said he had learned that Gruzen was not taking any medication while he was in jail in Faulkner County. According to him, Gruzen had retreated into fantasies and auditory hallucinations. He expressed the opinion that Gruzen did not know what was going on at the hearing, but had other voices to which to listen. Dr. Yohe had been unable to have full and free communication with Gruzen on any subject and said that Gruzen was incapable of talking "straight" for more than a few seconds and would change the subject three or four times in a single sentence in a very illogical way. In his opinion, Gruzen, in a situation where stress was involved, like a criminal trial, would go "way off the subject." He doubted that, in a criminal case where the punishment might be death, an attorney would get any relevant material from Gruzen. Dr. Yohe found that Gruzen's condition had deteriorated considerably between his last observation of him at the state hospital and the one on the day before Yohe testified.

Dr. Albert Rosendale, the examining psychiatrist, testified that before Gruzen was brought before the combined staff of the hospital on July 19, he had concluded that Gruzen had the mental capacity to understand the proceedings

against him and to assist effectively in his defense, and that, in spite of the fact that he changed his opinion as to diagnosis and joined in the staff opinion, he had observed Gruzen during his subsequent stay in the hospital and, while he was still convinced as to the staff diagnosis of "schizophrenic, paranoid type," he was of the opinion that Gruzen had the capacity to assist in his defense and to understand the proceedings against him at the time of the hearing. Dr. Rosendale emphasized the fact that Gruzen said repeatedly that, upon advice of his attorney, he was not to discuss anything concerning the crime with which he was charged. Dr. Rosendale said, however, that he had not seen Gruzen in two months, and did know what his condition was at the time he was testifying. He stated that Gruzen's condition might have either improved or deteriorated during the two months after he had left the state hospital. He had heard Dr. Yohe's testimony, and did not question that doctor's observation that Gruzen had greatly deteriorated mentally. He said that, if Gruzen were sent back to the hospital he would reevaluate him, and that the psychiatric staff had been asked to re-evaluate him, but that he would not be able to comment on his condition three months later.

Lt. Ken McFerrin of the Arkansas State Police, who attended Gruzen's extradition hearing in New Jersey and then brought him back to Arkansas, had visited Gruzen in the Faulkner County jail after the hospital observation and felt that Gruzen was oriented as to time and place and knew where he was. McFerrin said that he and Gruzen had a nice visit, that Gruzen knew him, remembered their association and discussed their trip with him. McFerrin stated that, when he and Gruzen were leaving New Jersey, Gruzen was instructed by his attorney not to talk with "anyone about anything."

At the conclusion of the hearing, the trial judge stated, "The court holds that this is a question for the jury to decide." In this, the court erred. No person who, as a result of mental disease or defect, lacks capacity to understand the proceedings against him or to assist effectively in his own defense shall be tried, convicted or sentenced for the commission of an offense, so long as the incapacity endures.

Ark. Stat. Ann. § 41-603 (Repl. 1977). It is certain, beyond reasonable doubt, that Gruzen has a mental disease or defect. When his fitness to proceed with the trial became an issue, it was the duty of the court to make a determination of that issue, either on the report of the Arkansas State Hospital or after a hearing on that issue. Ark. Stat. Ann. § 41-606 (Repl. 1977). This is a matter that must be decided by the trial judge, and it is reversible error for him to leave the matter to the jury to decide. *Westbrook* v. *State,* 265 Ark. 736, 580 S.W. 2d 702 (1979).

The error in procedure on the question of appellant's competency to stand trial was not in submitting the question to the jury; it was in not making an independent pretrial determination of the issue before putting appellant to trial. In this respect we disagree with the state's argument that submission of the question to the jury cured the trial judge's error in not making the determination himself. The state cites *Forby* v. *Fulk,* 214 Ark. 175, 214 S.W. 2d 920, where it was held that it was not the purpose of an earlier statute on the subject to deprive the jury selected to determine guilt or innocence of a defendant of the determination of the fact question as to the defendant's sanity at the time of the trial. The statute there involved and the statute before us are not at all similar and the question presented is very different. In *Forby,* we simply held that a previous act requiring postponement of trial on the question of guilt or innocence until a jury had determined whether the defendant was, at the time, of unsound mind was repealed by Initiated Act 3 of 1936. We held, however, that Initiated Act 3 did not leave the question of sanity to the Arkansas State Hospital, but merely provided the jury at the time of trial with the assistance of the trained staff of the Arkansas State Hospital on the issue of sanity when it was raised. The statute involved here provides for a procedure completely different from that prescribed prior to the adoption of Initiated Act 3 and from that approved in *Forby.* The failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial. *Drope* v. *Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L. Ed. 2d 103 (1975).

It has been suggested that we should not reverse this case on this ground because appellant, rather than argue that the trial judge had erroneously declined to decide this issue, argues only that the court's decision was erroneous. However, in a case where the sentence is life imprisonment without parole, we must examine the record for prejudicial errors. Ark. Stat. Ann. § 43-2725 (Repl. 1977); *Collins* v. *State,* 261 Ark. 195, 548 S.W. 2d 106, cert. den. 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed. 2d 158, reh. den. 434 U.S. 977, 98 S.Ct. 540, 54 L.Ed. 2d 471 (1977). Appellant, in order to preserve a question for review on appeal had to do nothing more than make known to the trial court what he sought in the way of a ruling. Ark. Stat. Ann. § 43-2725.1 (Repl. 1977); *Ford* v. *State,* 253 Ark. 5, 484 S.W. 2d 90. Clearly, he sought to be declared unfit to proceed with the trial because of his incapacity to understand the proceeding or to assist effectively in his own defense. But, if there is any doubt about the question having been preserved, it is totally dispelled by the fact that immediately after the court's ruling, Gruzen's attorney stated: "Save our exceptions." Thus, even if this question had not been argued in appellant's brief at all, it would not have been waived, and was not waived, on appeal. *Collins* v. *State,* supra; *Smith* v. *State,* 259 Ark. 703, 536 S.W. 2d 289; Ark. Stat. Ann. § 43-2725 (Repl. 1977).

The fact that there was a great potential for prejudice in the court's failure to rule on the issue may be easily demonstrated, if the mere failure to make a ruling cannot be said to be prejudicial in and of itself. During the course of the trial, Dr. Rosendale, upon whose testimony the state relied heavily at the pretrial hearing, even though he had not seen Gruzen for two months, heard news reports, after this hearing, that Gruzen was fasting. Dr. Rosendale then visited Gruzen in the Faulkner County jail one week before the trial began. Dr. Rosendale was called as a rebuttal witness by the state.

On cross-examination, Dr. Rosendale told of his visit a week before the trial to Gruzen in a jail cell in which Gruzen was the sole occupant. Dr. Rosendale said that Gruzen was delusional at that time, had told Rosendale of a revelation from God about secret passageways at Rogers Hall at the

Arkansas State Hospital that were used by Rosendale, had given Rosendale a special diet he had worked out for the cure of all mental illnesses in prisons and jails, had related that his attorney Jack Lessenberry had claimed to be his defense attorney, but was not working for him, and that Lessenberry's services were not needed because God was taking care of him. Based upon this interview, Dr. Rosendale expressed the opinion that Gruzen could not effectively assist Lessenberry in his defense and that he was of no use whatsoever to Lessenberry in that defense. Rosendale also testified that not only had he failed to gain Gruzen's confidence, but he did not think that Gruzen had cooperated with Lessenberry any better than he had with him.

The probability that there was prejudice is further demonstrated by the presentence hearing. After the verdict was returned, Gruzen's attorney Lessenberry moved for a new trial on the basis that Gruzen had been unable to assist his defense counsel in the preparation for and during the trial. When Lessenberry asked that there be a hearing on the motion, the prosecuting attorney resisted on the basis of the pretrial hearing, saying that the purpose had been to determine whether Gruzen was competent to aid in the preparation of the trial and objected to Lessenberry's being allowed to testify about anything that might have happened during the course of preparations. Lessenberry was permitted to testify. (Gruzen was represented by another attorney at this hearing.) Lessenberry stated that he got no assistance from Gruzen during pretrial preparations or during the course of the trial and that this was the first case in which he had no input or assistance from the defendant. He expressed the opinion that Gruzen was not competent to assist him. He said that he had been unable to separate fact from fantasy in his discussions with Gruzen. We cannot say that the court's error was harmless, since the evidence at the pretrial hearing that Gruzen had the capacity required for trial pursuant to Ark. Stat. Ann. § 41-603 was not beyond doubt and the resulting potential for prejudice was very great. The case must be reversed and remanded for a new trial because of the trial court's failure to make a determination of Gruzen's fitness to stand trial, so we must consider all other matters, either argued on this appeal or, if not argued here, where

objections were made in the trial court, unless they are not likely to arise in a new trial.

The first such matter is appellant's contention that the trial court erred in failing to suppress all evidence obtained as a result of a breach of the psychotherapist-patient privilege. The privilege is recognized in the Arkansas Uniform Rules of Evidence, Ark. Stat. Ann. § 28-1001 (Repl. 1979), Rule 503. That rule provides that a patient has a privilege to prevent any other person from disclosing confidential communications made for the purpose of diagnosis or treatment of his mental or emotional condition among himself, psychotherapist and persons who are participating in the diagnosis or treatment under the direction of the psychotherapist, including the patient's family. The state contends that the New Jersey statute governs rather than the Arkansas statute upon which appellant relies. For the purposes of this opinion, we assume, without deciding, that the Arkansas Statute is applicable, even though it is more favorable to appellant than the New Jersey statute.

The question arises from the denial of appellant's motion to suppress evidence. That motion was directed primarily to suppression of evidence definitely connecting Gruzen with the State of Arkansas, during the period in April, 1976, that he was away from his parents' home. The evidence was seized under a warrant to search the dwelling house of Gruzen's parents in New Jersey. The other evidence which appellant contends resulted from the alleged breach of privilege was Gruzen's name.

The evidence discloses that when Gruzen went to Dr. Pusin upon his return to New Jersey he related a story that seemed to be the cause of his agitated condition, but Dr. Pusin was unable to determine whether it was fact or fantasy. Dr. Pusin felt that this situation called for the services of a forensic psychiatrist. Because he had little experience in that area of psychiatry and because he was having difficulty remaining objective due to the fact that he had grown very close to Gruzen during the 17 years of treating him, Dr. Pusin asked Dr. Eugene Revitch to participate in the diagnosis and treatment of Gruzen. After a two or three hour

examination, Dr. Revitch concluded that the incident was factual and that Gruzen was in a psychotic state and potentially suicidal. Dr. Revitch was tormented by the fact that, based on his conclusions, he knew the facts of a horrible crime, but his action was restricted by the patient's privilege. After conferring about the situation with two consultants and an unsatisfactory review of the literature on the subject, Dr. Revitch decided that it was his obligation to find out about the crime. Capt. Donald Vallatt of the office of the prosecutor for Union County, New Jersey had been a friend of Dr. Revitch for 25 years, so Revitch called his friend for information, seeking to confirm his suspicion that he was dealing with reality, not fantasy. Revitch asked Vallatt to find out whether there had been any murders or girls reported missing in Arkansas within the preceding few days. As a result of this inquiry, Lt. John Mason called the North Little Rock Police Department and asked them to check with the National Crime Information Center, and, as a result, learned that an offense such as that described by the doctor had recently occurred in Arkansas. According to Dr. Revitch, when Vallatt asked that he be given the name of the person Dr. Revitch was talking about, the doctor refused at first, but when the officer started shouting, he stated that the person's first name was John. Capt. Vallatt said that Dr. Revitch did not give him any name.

Gruzen's parents were naturally concerned about their son's condition. They were unaware of the story Gruzen had related to the psychiatrists. Either Revitch or his wife told the Gruzens to call Capt. Vallatt if they wanted information about John. When the Gruzens called Vallatt, he quickly connected their call with his conversations with Dr. Revitch and realized that John Gruzen was a suspect in the murder of Dana Diane Mize. He conveyed this information to Lt. John Mason, who, after discussing it with authorities in North Little Rock, applied for a warrant to search the Gruzen residence, relying upon the information received from Vallatt to establish probable cause. Since Gruzen's parents had given their telephone number to the police, the police were able to obtain the address of the Gruzen residence. The items seized enabled Arkansas authorities to make a case against Gruzen, although prior to the disclosures made by

Dr. Revitch, they had no substantive clues whatever as to the identity of the little girl's slayer.

In approaching this question, we must remember that Dr. Revitch was not called to testify at the trial and the state was not endeavoring to introduce any statement made by him. Appellant is attempting to invoke the exclusionary rule developed by such cases as *Weeks* v. *United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914) and applied to the states by such cases as *Mapp* v. *Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 2d 1081 (1961). The exclusionary rule was developed as a deterrent to unlawful action of police officers. It is not applicable to action by private citizens, even when they inform state officers of matters coming to their knowledge. *Walker* v. *State,* 244 Ark. 1150, 429 S.W. 2d 121; *United States* v. *Burton,* 475 F. 2d 469 (8th Cir., 1973).

Appellant seeks to invoke the "fruit of the poisonous tree doctrine," citing *Silverthorne Lumber Co.* v. *United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); and *Wong Sun* v. *United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed. 2d 441 (1963). This doctrine, which had its inception in *Silverthorne* and gained its name in *Nardone* v. *United States,* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), is another facet of the exclusionary rule which has application only when the tree is poisoned by unlawful action by police officers. In *Silverthorne,* it was said that it is knowledge gained by the government's own wrong that cannot be used. In *Wong Sun,* the United States Supreme Court dealt with evidence obtained as the result of an unlawful arrest and an unlawful invasion of the dwelling place of the accused to make the arrest. It was said in that case that the exclusionary rule does not apply when the government independently obtains knowledge of the evidence apart from its own unlawful activity. Appellant's argument that, in cooperating with Capt. Vallatt, Dr. Revitch acted on behalf of the state is neither convincing, nor accompanied by citation of any authority, and we find no merit in it. There was no unlawful action by police officers in discovering the identity of Gruzen. The violation of the privilege by the psychiatrist was not police action.

We do not find the case of *Lewis* v. *State,* 265 Ark. 132,

577 S.W. 2d 415 (1979) analogous to this situation, as appellant suggests. That case involved a holding that the petitioners there were entitled to a hearing on a petition for post-conviction relief on the ground that their constitutional right to counsel had been violated by communication of confidential and privileged information by their retained attorney and an investigator employed by that attorney.

The prosecuting attorney introduced photographs of the body of Dana Mize taken when it was removed from a stock pond on the farm of Richard Hendrickson, where it was discovered by Hendrickson on April 16. One of them showed the position of the victim's body as it floated in the pond, and two of them, taken after the body was removed from the pond, showed injuries to Dana's face. No objection was made to the first of these photographs, but appellant's counsel objected to the two photographs showing damage to the girl's face on the ground that they were inflammatory. Appellant concedes that the question of admissibility of photographs lies largely in the discretion of the trial judge. See *Stewart* v. *State,* 233 Ark. 458, 345 S.W. 2d 472, cert. den. 368 U.S. 935, 82 S.Ct. 371, 7 L.Ed. 2d 197; *Tanner* v. *State,* 259 Ark. 243, 532 S.W. 2d 168. Of course, if a photograph serves no valid purpose and can only result in inflaming the passions of the jury, it is inadmissible. *Perry* v. *State,* 255 Ark. 378, 500 S.W. 2d 387. A photograph is admissible when it tends to corroborate the testimony of a witness, show the nature and extent of wounds or the savagery of an attack, or is useful to enable a witness to better describe objects portrayed or the jury to better understand the testimony. *Davis* v. *State,* 246 Ark. 838, 440 S.W. 2d 244; *Perry* v. *State,* supra; *Stewart* v. *State,* supra; *Tanner* v. *State* supra. If a photograph, although it may be inflammatory, does serve a valid purpose, we will not reverse the decision of the trial court, even in a capital case, unless it is shown that there was a clear abuse of the trial court's discretion. *Hulsey* v. *State,* 261 Ark. 449, 549 S.W. 2d 73, cert. den. 439 U.S. 882, 99 S. Ct. 220, 58 L. Ed. 2d 194. See also, *Tanner* v. *State,* supra; *Milam* v. *State,* 253 Ark. 651, 488 S.W. 2d 16.

The two photographs in question show the flesh on the jaw of the victim torn away from the body, exposing the lower maxillary and the jaw. Dr. Rodney Carlton, then State

Medical Examiner, was called to the stock pond on the Hendrickson farm where the body had been found by Hendrickson. Dr. Carlton testified about the appearance of the face and the tearing of the flesh of the lower jaw, and said that it was consistent with the striking of a blunt force, or with the person having been dragged over a freshly cut stub, or something of that nature. Dr. Carlton said that the photographs accurately depicted the facial injuries he described, and that they indicated a glancing injury. He was not aware of the fact that the pond was being used to grow catfish, but he had assumed that there were fish and turtles in the pond. Dr. Carlton expressed the opinion that Dana was alive when she was put in the pond.

Hendrickson saw the face of Dana Mize when her body was removed from the stock pond. He testified that the flesh around the right side of her mouth was hanging down. Lt. Ken McFerrin was present when the body was taken from the water. He testified that the photographs accurately depicted the condition of the body and the facial injuries. Dr. Bob Bannister, Coroner of Faulkner County, who was also present when the body was removed, testified that the photographs depicted the body as he saw it.

Even though those photographs were corroborative of the testimony of these witnesses, appellant says that the photographs should not have been admitted into evidence because there was no evidence to show who or what caused the tearing of the flesh. It is true that there is no direct evidence in this regard, but there are circumstances from which a jury might draw an inference. Hendrickson said that he kept the area around the pond "bush-hogged." He kept cattle of various colors and breeds there. Dr. Carlton testified that, when he examined the body, he found hair upon it that was of non-human origin. In addition to the facial tear, there were superficial scratches and abrasions about the face which, according to Dr. Carlton, could have been caused by fingernails or briars. It would not be unreasonable for a jury to believe that Dana had been dragged across the field before she was put into the pond or to accept the idea that the facial tear resulted from her face having been dragged across a stub in the field, and that the facial scratches supported such

inferences. Dr. Carlton found bruises on Dana's neck which he said were consistent with manual strangulation.

In *Rodgers* v. *State*, 261 Ark. 293, 547 S.W. 2d 419, we said that the test should always be whether any necessarily inflammatory tendency of a photograph is outweighed by its probative value. We there recognized that this determination lay in the sound judicial discretion of the trial court. In this case, we are unable to say there was an abuse of discretion. We note that Rule 403 of the Arkansas Rules of Evidence [Ark. Stat. Ann. § 28-1001, Rule 403 (Repl. 1977)] now governs this question. Under that rule relevant evidence may be excluded only if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence. It may be seen that the rule stated in *Rodgers* has been changed by tipping the scales in favor of the probative value of a photograph. We also note that error may not be predicated upon a ruling admitting evidence unless a substantial right of the objecting party is affected. Ark. Stat. Ann. § 28-1001, Rule 103 (a). This does not affect our previous holdings that weighing of the opposing factors lies within the sound judicial discretion of the trial court, which will not be disturbed on appeal in the absence of a clear showing of abuse of that discretion. We find no abuse here.

Appellant argues that the photographs should not have been presented to the jury when it cannot be stated with any certainty that he actually caused the damage depicted by them. A short answer to this argument is that the test of the trial court's discretion is simply not that rigid. There was circumstantial evidence connecting him with the disappearance of the young girl. The fact that she was last seen with appellant is significant. See *Parker* v. *State*, 252 Ark. 1242, 482 S.W. 2d 822.

Appellant also argues that the photographs should have been excluded because of the bifurcated trial in capital cases. He points out that neither the savagery of the attack nor the sadistic mind of the attacker is an aggravating circumstance the jury is allowed to consider in the second or sentencing

phase of the trial. See Ark. Stat. Ann. § 41-1303 (Repl. 1977). Furthermore, he contends that, under the capital murder statute, no culpable mental state is required under the applicable section of the statute, which is Ark. Stat. Ann. § 41-1501 (1) (a) (Repl. 1977). The statute does require a showing, however, that the death of the victim was caused under circumstances manifesting extreme indifference to the value of human life, and the photographs were relevant on that subject. We cannot say, therefore, that the photographs were not relevant to shed light on that issue. There was certainly no prejudice to appellant in the second stage of the bifurcated trial, because the jury chose the lesser punishment.

Appellant also contends that the jury arbitrarily disregarded the testimony on the issue of appellant's mental disease or defect and, therefore, their verdict is against the weight of the evidence. We do not determine the weight of the evidence on this appeal. The question is whether there is any substantial evidence to support the verdict. Actually, in arguing this point, appellant concedes that he bore the burden of proof on this affirmative defense and that the real question is whether there is any substantial evidence to support the verdict. See *Campbell* v. *State,* 265 Ark. 77, 576 S.W. 2d 938 (1979). But appellant says that the jury arbitrarily disregarded the evidence showing that because of mental disease or defect he lacked capacity to conform his conduct to the requirements of law or to appreciate the criminality of his conduct. The testimony which the appellant says the jury disregarded was that of expert witnesses who expressed opinions on the issue. No useful purpose would be served by a review of all the evidence on this point, other than to show that there was substantial evidence to support the jury verdict which prevents us from saying that the jury arbitrarily disregarded the testimony. As we have previously said, the expert testimony that Gruzen has a mental disease or defect is undisputed. This does not mean, however, that he was necessarily without capacity to conform his conduct to the requirements of law or to appreciate the criminality of his conduct.

A jury is not bound to accept opinion testimony of

experts as conclusive, and it is not compelled to believe their testimony any more than the testimony of other witnesses who testify. *Mutual Benefit Health & Accident Ass'n.* v. *Moore,* 196 Ark. 667, 119 S.W. 2d 499. It may consider an expert's opinion in the light of the expert's qualifications and credibility, the reasons given for his opinion, and the facts and other matters upon which his opinion is based, but it is not bound to accept an expert opinion as conclusive. A jury should give the opinion whatever weight it thinks the opinion should have and may disregard any opinion testimony it finds unreasonable. AMCI 105.

Expert witnesses are allowed to give opinion testimony only as an aid to the jury in understanding questions inexperienced persons are not likely to decide correctly without such assistance, but expert testimony is entitled only to such consideration as it appears to the jury to deserve. *American Bauxite Co.* v. *Dunn,* 120 Ark. 1, 178 S.W. 934, Ann. Cas. 1917C 625.

Testimony of expert witnesses is to be considered by the jury in the same manner as other testimony and in the light of other testimony and circumstances in the case; the jury alone determines its value and weight, and may, under the same rules governing other evidence, reject or accept all or any part thereof as they may believe it to be true or false. *Western Union Telegraph Co.* v. *Byrd,* 197 Ark. 152, 122 S.W. 2d 569; *United States Fidelity & Guaranty Co.* v. *Park,* 254 Ark. 129, 491 S.W. 2d 791. Even when several competent experts concur in their opinions and no opposing expert evidence is offered, the jury is still bound to decide the issue upon its own fair judgment. *Western Union Telegraph Co.* v. *Turner,* 190 Ark. 97, 77 S.W. 2d 633. The jury must consider the opinions of the experts in connection with all the other evidence in the case. *Kelley* v. *State,* 146 Ark. 509, 226 S.W. 137. The jury is the sole judge of the credibility of expert witnesses and the weight to be given their testimony, just as is the case with the testimony of other witnesses. *Kelley* v. *State,* supra. Testimony need not be regarded as undisputed merely because it is not directly contradicted if, from other facts and circumstances in the record, any reasonable inference can be drawn contrary thereto. *Western Union Telegraph Co.* v. *Byrd,* supra.

There was substantial evidence to support the jury verdict. A witness called by appellant, Dr. B. Travis Tunnell, Jr., a clinical psychologist, suspected after his first interview with Gruzen that Gruzen was malingering and might not have been totally honest, and this thought crossed his mind after a second interview. A report of Dr. Tunnell in the form of a letter to the prosecuting attorney included a finding that Gruzen was above average in intellect. Dr. Tunnell testified, in answer to a hypothetical question which included facts in evidence or which might have been inferred from the evidence, about Gruzen's conduct between the time he left New Jersey and the time he took a train to return there and expressed the opinion that Gruzen was competent at that time. Gruzen's mother testified that he did not graduate from high school, but was admitted to college by taking equivalency tests. His intelligence quotient was in the superior intellectual range. Dr. Albert F. Rosendale was the examining psychiatrist who observed Gruzen for 45 days before he was presented to the staff at the Arkansas State Hospital. Dr. Rosendale presented him as being competent.

Dr. Allen Graham Tuff, a psychologist employed at the Human Services Center as Director of Clinical Services, said that his first reaction to the results of one test heavily relied upon by expert witnesses who testified on behalf of appellant was that the test was invalid and above the range of interpretability. In his opinion, it indicated that Gruzen was faking. He said that another test of Gruzen showed a perfect score on judgment and abstract reasoning. This witness was experienced in interpretation of the tests which had been administered to Gruzen. Dr. Tuff, in response to a hypothetical question similar to that propounded to Dr. Tunnell, expressed the opinion that, applying the legal tests applicable in Arkansas as to ability to appreciate the criminality of his conduct or conform his conduct to the requirements of law, Gruzen was legally sane.

Dr. Albert F. Rosendale, who was Chief of the Forensic Psychiatric Section of the Arkansas State Hospital, expressed the same opinion in response to the same hypothetical question. Dr. Rosendale was of the opinion that Gruzen's persistent adherence to his attorney's advice not

to discuss the events pertaining to the charge against him indicated his ability to appreciate the criminality of his conduct.

There was testimony about Gruzen's conduct from the time of his arrival in Arkansas until his return to New Jersey. Some of this conduct was consistent with that of a legally competent person. There was sufficient substantial evidence to support the jury's finding that Gruzen was legally responsible for his acts when the crime was committed.

Although appellant argued no other points for reversal, we have reviewed the record for prejudicial error, as required in a case where the sentence is life imprisonment without parole. Some of the matters to which appellant made objection and requests rejected by the court will not likely arise on retrial. Appellant's motion for a directed verdict at the close of the evidence on behalf of the state on the basis that the state had not shown that he was sane was not well taken. The defense of mental disease or defect is an affirmative defense which defendant must prove by a preponderance of the evidence. Ark. Stat. Ann. § 41-601, -110 (Repl. 1977). We do not deem it necessary to review the evidence which showed that Dana Mize had been kidnapped, raped and drowned, that Gruzen was in and around Little Rock, Conway and Vilonia at the time this happened, that he had rented a car which matched the description of that into which Dana was pulled as she was walking toward her home on the day she disappeared, or that a hair sample taken from the victim matched samples taken from the rented car, other than to say that it was sufficient to present a question for the jury, so motions for a directed verdict were properly denied.

The judgment is reversed and the cause remanded for a new trial.

HARRIS, C.J., not participating.

PURTLE, J., concurs.

HICKMAN, J., dissents.

JOHN I. PURTLE, Justice, concurring. Were I to allow my emotions to control my judgment I would dissent from the majority view in this capital felony case. However, after

reviewing the record, I am convinced the majority properly state the law as we have treated it in the past. The law has not changed since we stated in *Bly* v. *State,* 263 Ark. 138, 562 S.W. 2d 605 (1978).

> It is our duty in a capital felony case to examine the entire record for not only errors raised on appeal but also those that may be found in the record.

The record clearly reveals appellant raised the issue of competency to stand trial. Ark. Stat. Ann. § 41-606 (Repl. 1977) states:

> If the defendant's fitness to proceed becomes an issue, it shall be determined by the court. If neither party contests the finding of the report filed pursuant to section 605 (§ 41-605), the court may make the determination on the basis of the report. If the finding is contested, the court shall hold a hearing on the issue.

The above statute placed the duty upon the trial court to make the decision of whether the appellant was competent to stand trial. The trial court did not make that determination. It is our duty to return the case to the trial court for a new trial. We are not free to decide any case in a manner which we personally feel expedites justice unless the accused has been afforded due process of law and has received equal treatment. Such consideration is basic to our form of government and required by the Constitution of the State of Arkansas and the Constitution of the United States.

DARRELL HICKMAN, Justice, dissenting. I dissent because the judgment is being reversed for a reason not raised on appeal.

There was no objection preserved in the record regarding the trial court's failure to rule on Gruzen's competency to stand trial. There is no argument at all on appeal that the court erred in not deciding that issue itself.

Not even in capital cases do we search for errors not preserved at the trial level.

While the evidence was strong that Gruzen was in no condition to stand trial, there was substantial evidence to the contrary. If the court had ruled him competent to stand trial, which in effect is what was done, I would not reverse that decision.

In summary, this case is reversed for no reason alleged below or argued on appeal.