Michael Eugene TITUS *v.* STATE of Arkansas

CR 79-140                                           593 S.W. 2d 164
Supreme Court of Arkansas
Opinion delivered February 4, 1980

10

*John M. Bynum,* for appellant.

*Steve Clark,* Atty. Gen., by: *Catherine Anderson,* Asst. Atty. Gen., for appellee.

JOHN A. FOGLEMAN, Chief Justice. Appellant Titus was charged with capital murder and found guilty of first degree murder by a jury and sentenced to life imprisonment. He seeks reversal and argues the following points:

I

THE COURT PREJUDICED THE APPELLANT BY REFUSING TO ALLOW A LAY DEFENSE WITNESS TO GIVE HIS OPINION AS TO TITUS' MENTAL CONDITION.

## II

THE COURT PREJUDICED TITUS BY
ADMITTING THREE CONFESSIONS INTO
EVIDENCE.

## III

THE EVIDENCE IS INSUFFICIENT TO
SUPPORT A CONVICTION FOR FIRST DEGREE
MURDER

## IV

THE COURT PREJUDICED TITUS BY
ADMITTING INTO EVIDENCE A SHELL CASING
AND A LEAD FRAGMENT (STATE'S EXHIBIT
FIFTEEN) ON THE GROUND THAT THE STATE
FAILED TO PROVE AN UNBROKEN CHAIN OF
CUSTODY OF THIS EVIDENCE.

We find no merit in these points and no reversible error.

Titus was accused of killing his aunt, Leota Snyder, at the home of another aunt, Helen Foster, with whom both Titus and Mrs. Snyder lived. Mrs. Snyder was killed at about noon on March 21, 1978. Her body was found on the floor near the kitchen with her head covered by a towel. She had received two head wounds. The fatal shot penetrated her face and brain. Titus was arrested in Moline, Illinois on March 22, in possession of Mrs. Snyder's automobile, a shotgun, some shells and a small amount of money. After having been advised of his rights by Illinois officers who arrested him, he confessed that he had shot Mrs. Snyder with a .22 caliber rifle. Titus waived extradition and was returned to Arkansas by Sheriff Larry Darter of Pope County and Lt. Finis Duvall of the Arkansas State Police. En route, Titus made another incriminating statement, after he had again been advised of his rights.

## I

Titus offered evidence of impaired mental condition in

mitigation of punishment. Gary Martin, a lay witness, who testified during the guilt phase of the trial, was asked if he had any feeling as to whether Titus might have had some mental problems. When the state's objection was sustained, appellant's attorney stated that the evidence was offered in mitigation. Appellant relies upon Ark. Stat. Ann. § 28-1001 (Repl. 1979), Rule 701, governing opinion evidence of lay witnesses and Ark. Stat. Ann. § 41-1301 (4) (Repl. 1977). Martin had testified, prior to the objection, that Titus was a very quiet person who had few friends, who kept to himself, did not seek trouble and avoided confrontations. After the objection was made, Martin testified that Titus was a loner, who would withdraw from society, even to the extent of failing to answer his telephone, who caused no problems with anyone else and who did not want any contact with the public at all.

Even though the court may have been in error in his position that a medical opinion was called for, the court's ruling was on the basis of the particular question asked. No proffer of the testimony was made. There was expert opinion evidence that Titus had a personality disorder which was a mental disease or defect which impaired his ability to conform his conduct to the requirements of law. Since the trial had not reached the sentencing stage on the original charge of capital murder, there was no reason for presenting evidence of this mitigating circumstance. The purpose for which this opinion testimony was offered is clearly shown by reference to the closing argument on behalf of appellant. There appellant's attorney stated that the mitigating evidence offered, including that of Martin, was not relevant to the question of guilt or innocence and was not offered for that purpose. There was never a suggestion that the evidence was offered for any other purpose than mitigation. After the verdict of guilt of first degree murder was returned, the jury was instructed as to the sentence to be imposed. No proffer of Martin's opinion, whatever it may have been, was made at that time.

Under the Arkansas Uniform Rules of Evidence, error may not be predicated upon a ruling which excludes evidence unless a substantial right of the party is affected. Ark. Stat.

Ann. § 28-1001, Rule 103(a) (Repl. 1979). Even though the strict rules of evidence would not have governed in the sentencing phase of the trial, had appellant been found guilty of capital murder, any error in the court's ruling was harmless, since the jury's verdict found Titus guilty of the lesser offense, since no proffer of the testimony Martin would have given in response to the particular question asked about his "feelings" as to whether or not [Titus] might have had some mental problems was ever made, and since the question asked called for speculation.

## II

Titus moved to suppress three confessions or incriminating statements. A pretrial Denno hearing has held and the statements were determined to be voluntary. We make an independent determination of voluntariness, but do not reverse the trial court's findings unless they are clearly against the preponderance of the evidence. *Degler* v. *State,* 257 Ark. 388, 517 S.W. 2d 515.

Appellant first contends that his initial statement was coerced because it was made shortly after he was arrested by officers Fisher and Gerchen at gunpoint, placed on the ground and handcuffed. He also contends that he had a mental disease or defect and that no evidence was presented to rebut testimony to that effect. Fisher and Gerchen were investigators for the Rock Island County, Illinois, Sheriff's office. These officers had received information that Arkansas officers were searching for a suspected murderer named Michael Titus, who was believed to be on his way to the Rock Island area. They had been given a description and a photograph of Titus. At about 10:30 a.m., they saw Titus driving into the parking lot at a Holiday Inn. As he started to get out of the automobile he was driving, they pulled alongside it in their vehicle, drew their guns and placed Titus under arrest. Fisher pointed his .38 caliber pistol at Titus's face from a distance of four or five feet. With their weapons still drawn, the officers directed him to lie down on the ground in front of the car in which he had been. Fisher then returned his weapon to its holster, "frisked" Titus and handcuffed him, while Gerchen stood by with his weapon still

drawn. No physical force was used, except that required for putting handcuffs on Titus. After Titus was handcuffed, Gerchen put his weapon away. Gerchen then read a statement of constitutional rights to Titus. Fisher took a shotgun from the automobile Titus had been driving. Fisher made an inventory of the contents of this car. In addition to the shotgun he removed, Fisher found a box of shotgun shells, some packages, a Timex watch, two tapes and a registration certificate. Fisher then questioned Titus and ascertained his identity. He then asked Titus whether the shotgun was the murder weapon and Titus replied that it was not and that he had "shot her with a rifle." When asked about stains on his clothing, Titus said that they were blood stains from the woman whom he had killed.

About 20 minutes after his arrest, Titus was taken to the Rock Island County Sheriff's office, six or seven miles away; where his clothing and personal property were taken from him and he was dressed in a jail uniform. He was again advised of his rights from a standard form, which Titus was asked to read along with Fisher. After Titus had read the statement of each of his rights, Fisher asked Titus if he understood and asked him to place his initials opposite that statement if he understood. Titus "initialled" each statement. Titus signed a waiver of rights after Fisher had again asked Titus to give his name and ascertained that Titus had a twelfth grade education, caused Titus to read the first two lines of the waiver form aloud, and received a response from Titus that he understood it. Titus then gave a statement in response to questions by Fisher, which amounted to a confession. This oral statement was tape recorded and then transcribed after which Titus signed it. The statement commenced at 11:35 a.m.

According to the officers, Titus was calm at all times and never gave the appearance of being nervous, excited or emotional. Titus did not, at any time, indicate that he did not wish to respond to questions or that he wanted an attorney. He failed to respond to four questions, but did not indicate that he wished to remain silent. Titus never indicated that he did not understand any question. Titus was never threatened or struck.

Appellant offered no rebuttal of the testimony of officers Fisher and Gerchen, even though his attorney stated, after the state's evidence on the motion to suppress these statements had been concluded, that he had discussed the matter with Titus and offered him the opportunity to testify. The trial judge advised him that he had the privilege of testifying, but could not be compelled to do so. Titus then declined to testify. Even though appellant was specifically offered the opportunity to offer other evidence, he did not, so the testimony of the police officers must be taken as undisputed. No argument was advanced that the statement was not voluntary because of any mental infirmity. The only contention made by appellant at that time was that the statements made to officers Fisher and Gerchen were involuntary because appellant's first admissions were made shortly after he had been held at the point of a gun.

Another statement, which also amounted to a confession, was made to Finis Duvall, a criminal investigator with the Arkansas State Police and Sheriff Larry Darter of Pope County, who returned Titus to Arkansas from Illinois. Again, the motion to suppress was heard only upon the testimony of the officers and the court's ruling was made after Titus had been given the opportunity to testify and had declined, after an offer by his attorney and a repeated explanation of his rights by the trial judge. The only basis of the objection to this statement was that it was "tied up" with the two previous statements given to the Illinois officers.

Duvall testified that he had talked to Titus on March 24 while they, with Darter, were en route from Harrison to Russellville. Duvall said that, after he had received an affirmative answer to his inquiry whether Titus had been advised of his rights, he again advised Titus of his rights and Titus said that he understood, but did not sign a waiver, because Titus said he had already signed one. Titus then made a statement, which Duvall reduced to writing in narrative form and Titus signed after having read it and having had it read to him by Duvall. Duvall said that he had gone over the "Miranda" warnings with Titus in detail, that Titus said he understood and acted as if he did, that Titus said that he understood the statement after having read it and before signing it and that there were no weapons in sight when the statement was given. Darter corrobo-

rated the testimony of Duvall and stated that neither he nor Duvall beat, threatened or coerced Titus in order to obtain the statement. No other testimony was offered.

In order to reverse the holding of the circuit judge on these motions to suppress, we should have to say that every incriminating statement made by one arrested by police officers, who, suspecting that he might be armed, used weapons to effect the arrest, should be excluded. The exclusionary rule was never intended to be absolute or to have such a ridiculously extreme effect. It was intended to deter illegal police activities and nothing else. *Gruzen* v. *State,* 267 Ark. 380, 591 S.W. 2d 342 (1979). To give it the effect appellant desires would make it an absurdity.

We do not consider appellant's argument pertaining to his allegedly impaired mental condition in connection with these statements, because it is raised for the first time on appeal. No evidence on that issue was offered at the suppression hearing and no motion was made to strike the statements after the testimony tending to show that Titus had some mental defect was offered. It is true that we review the entire record on the question of voluntariness of an incriminating statement, but we consider testimony offered after a Denno hearing only when the point has been properly raised in the trial court. *Hignite* v. *State,* 265 Ark. 866, 581 S.W. 2d 552 (1979).

## III

Appellant argues that the evidence was insufficient to support a conviction of first degree murder because there was no substantial evidence of premeditation or deliberation. He asserts that there was no evidence that the crime was committed under circumstances manifesting extreme indifference to the value of human life and in the course of, and in furtherance of, or in immediate flight from, a felony.

We do not agree with appellant that there was no evidence that the homicide was committed either in the

course of a felony, i.e., robbery or larceny, or in immediate flight therefrom.

Viewing it in the light most favorable to the state, as we must, the evidence shows:

Mrs. Helen Foster returned to her home at about 3:20 p.m. and found the body of her sister-in-law, Mrs. Leota Synder, who resided in the Foster residence, on the kitchen floor. When Mrs. Foster called for help from her nephew, Titus, she discovered that he was gone. When police officers arrived a few minutes later, it was discovered that Mrs. Snyder's head was bloody and there was a hole under her right eye. A .22 caliber rifle, which was one of three weapons Mrs. Foster kept at the house, was found standing in a corner in the kitchen. Two .22 caliber hulls or casings and a lead fragment were found near the body. An autopsy revealed that the cause of Mrs. Snyder's death was a bullet which had entered the right side of her face, penetrated her brain and become lodged inside her cranial cavity. There was another superficial skull wound to the back of the left side of her head. The pathologist who performed the autopsy expressed the opinion that the shots causing the wounds were fired from a range of four or five feet. Ballistics tests revealed that the casings found had been fired from the rifle found in the kitchen. The bullet, even though badly mutilated, had the same class characteristics or groove markings as the rifle. The time of Mrs. Snyder's death was estimated to have been between 12:00 noon and 2:00 p.m. on March 21, 1979. Mrs. Fisher found that a shotgun she owned and Mrs. Snyder's car were missing. When Titus was arrested, he was in possession of both.

Appellant also contends that the trial court erred by admitting a shell casing and a lead fragment into evidence because neither was identified by Mrs. Foster. Mrs. Foster testified that she found a .22 caliber cartridge on the floor after she had found Mrs. Snyder's body. She testified that she laid the cartridge on the kitchen counter, and later gave it to one of the officers. Officer Caldwell testified that, when he arrived at the scene, Mrs. Foster showed him the hull of cas-

ing she had placed on the counter. He said that, on the next day when he went to further check the crime scene, another casing was found under an end table and a lead fragment Mrs. Foster had found between a chair and the table was given to him, and that he had retained both casings in his possession until they were taken to the State Crime Laboratory. Capt. McDonald testified that he had received a mutilated lead fragment of a bullet and an expended .22 caliber Western Super "X" cartridge casing from Caldwell on April 3, 1978. These were identified by Caldwell as the casing he had recovered from the Foster residence and the fragment he had received from Mrs. Foster. McDonald still had these in his possession when he testified. Deputy Sheriff Sears, to whom McDonald returned some of the exhibits, said that he had never seen the fragment.

Appellant's objection at the trial was simply that the chain of custody of these two items was not shown beyond a reasonable doubt; it did not specifically point out that these items had not been identified by Mrs. Foster. We do not consider the failure of the state to ask Mrs. Foster to identify the items to be fatal to the chain of custody. Her testimony and that of Caldwell on the subject were sufficient showing that the cartridge casing was the same as that Mrs. Foster found. Even though Sears did not recall the lead fragment, McDonald's testimony related to a lead fragment he received from Caldwell, so we do not see how Titus was prejudiced by its introduction. The question of admissibility was for the trial judge and we will not reverse his decision because we cannot say that any substantial right of appellant was prejudiced, and because appellant did not specifically point out the defect in the chain on which he now relies. Ark. Stat. Ann. § 28-1001, Rules 103(a) and 104 (Repl. 1979).

We have reviewed the record for objections and motions made by appellant which were overruled or denied and find no error prejudicial to Titus.

The judgment is affirmed.

STROUD and MAYS, JJ., not participating.